# United States Court of Appeals
## For the First Circuit

No. 24-1062

UNITED STATES OF AMERICA

Appellee,

v.

ADMILSON PIRES, a/k/a Mikey,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Gelpí, Kayatta, and Aframe,
Circuit Judges.

Christine DeMaso, Assistant Federal Public Defender, for
appellant.

Karen Eisenstadt, Assistant United States Attorney, with whom
Joshua S. Levy, Acting United States Attorney, was on brief, for
appellee.

May 28, 2025

**GELPÍ**, **Circuit Judge**.  Following a four-day trial, a jury convicted Defendant-Appellant Admilson Pires ("Pires") of conspiracy to commit sex trafficking of a minor in violation of 18 U.S.C. § 1594(c) (Count I) and sex trafficking of a minor in violation of 18 U.S.C. § 1591(a)(1) and (b)(2) (Count II).  Pires appealed, arguing that the evidence was insufficient to support his conspiracy conviction and that various alleged trial errors -- namely, the erroneous admission of expert testimony and certain statements by the government during summation -- tainted the verdict.  For the reasons explained below, we **affirm**.

## I.  BACKGROUND

On August 1, 2019, Norwood Police Department ("Norwood PD") received a tip that Daisy -- a missing sixteen-year-old girl -- was located, and being used for prostitution, at an apartment in Norwood, Massachusetts.  At the apartment, Norwood PD officers found two women: the resident, Kathleen Burke ("Burke"), and a woman who claimed to be a twenty-year-old named "Melissa."  Moments into the encounter, Norwood PD officers saw that "Melissa" matched the photo on Daisy's missing person's notice, and after a few minutes of conversing, "Melissa" provided officers with her real name: Daisy.

After conversing some more with Burke and Daisy, Norwood PD officers were given consent to search Burke's cell phone.  They then brought Daisy and Burke separately to the Norwood PD station,

where Daisy told officers, among other things, that she had been engaging in commercial sex.  During Daisy's interview with Norwood PD officers, Burke's cell phone received several phone calls and text messages from two contacts -- "Eli 2" and "Mikey" -- who were later identified as Sandro Rosa ("Eli")[1] and Pires, respectively. At 4:24 p.m., Pires texted, "Hey, w[h]at happened to Mellisa [sic]," and about three hours later, Eli texted, "you fuck me over [K]athy [(Burke)] every[]time."  After interviewing Daisy, Norwood PD officers returned her to her mother.

On December 9, 2020, a federal grand jury returned a two-count indictment against Pires, charging him with conspiracy to commit sex trafficking of a minor in violation of 18 U.S.C. § 1594(c) and sex trafficking of a minor in violation of 18 U.S.C. § 1591(a)(1) and (b)(2).  Trial commenced on September 18, 2023, and lasted four days.  Eight witnesses testified, and when all was said and done, the jury convicted Pires of both offenses.  In January 2024, the district court sentenced Pires to a term of 132 months' imprisonment on Count I and 132 months' imprisonment on Count II, to be served consecutively.  Pires appealed.

The resolution of the instant appeal centers on the testimony of three witnesses -- Daisy, Burke, and FBI Special Agent Daniel Garrabrant ("SA Garrabrant") -- and the parties'

---

[1] Daisy knew Rosa only as Eli, and so that is how she referred to him.  Here, too, we refer to Rosa as Eli.

statements during summation. Rather than spell it all out here (and then again below), we summarize the relevant events and testimony in discussing each claim of error.

## II. ARGUMENTS ON APPEAL

Pires raises three challenges on appeal. First, he contends that his conspiracy conviction was not supported by sufficient evidence. Second, he argues that some of SA Garrabrant's testimony was erroneously admitted, corrupting the jury's verdict on both Counts I and II. And third, he takes issue with the government's statements during summation, which, he insists, inflamed the emotions of the jury and impugned the role of defense counsel, warranting reversal of both Counts I and II. We address these challenges in turn.

## III. SUFFICIENCY OF THE EVIDENCE

Pires's sufficiency challenge takes aim only at his conspiracy conviction. 18 U.S.C. § 1594(c). He insists that there is a dearth of evidence showing a conspiratorial agreement between him and either of the coconspirators offered by the government -- either Eli or Pires's uncle. Because we determine that there was sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that Pires and Eli conspired to violate § 1591(a)(1), the challenge fails. See United States v. Pena, 24 F.4th 46, 74 (1st Cir. 2022) ("When a jury returns a general guilty verdict on a [conspiracy] count, and there

- 4 -

is sufficient evidence as to one of two alternative theories of guilt in that count, . . . insufficiency of the evidence as to the other theory of guilt will not undermine the conviction." (footnote omitted)).

Both parties agree that the conspiratorial agreement piece of Count I rests largely on Daisy's and Burke's testimony. So that is where we turn our focus. As with all challenges to the sufficiency of the evidence, "we recount the facts in the light most favorable to the verdict." United States v. Buoi, 84 F.4th 31, 34 (1st Cir. 2023) (quoting United States v. Paz-Alvarez, 799 F.3d 12, 18 (1st Cir. 2015)).

**A. Daisy's Testimony**

We start with Daisy's testimony. Daisy began by explaining that from middle school until ninth grade, she had a "very toxic" relationship with her mother and stepfather. At times, her mother would kick her out, so Daisy would end up in the custody of the Massachusetts Department of Children and Families ("DCF") -- often in DCF-run group homes and sometimes in mental healthcare facilities.

In January 2019, Daisy (fifteen years old at the time) was in a DCF-run group home. With the help of her friend Jaleah (also a minor), Daisy ran away from the group home. She went to live at Jaleah's uncle's home in Brockton, Massachusetts. Daisy lived there for about a month, during which time Jaleah taught her

how to make money by posting explicit photos of herself on the website "MegaPersonals." While there, Daisy also met Pires, who was twenty-two years old at the time.

The day Daisy met Pires, she told him her age and showed him her missing person's notice containing her age and birthdate. That same day, Pires indicated to Daisy that he did not care about her age, and the two had sex. During the few weeks that Daisy remained in Brockton, she and Pires saw each other regularly, engaging in sexual intercourse each time. When apart, they communicated via phone call, text message, and Facebook. At some point in February 2019, Pires told Daisy that he loved her.

That same month, Pires and Daisy's physical relationship temporarily ended when Daisy went to live with another friend in Fall River, Massachusetts. Law enforcement recovered her from Fall River a few days after she moved there, and they brought her back to Springfield, Massachusetts. Daisy did not go to her mother's home immediately, opting instead to go to another group home. At that group home, she remained in contact with Pires by using the facility's phone.

Sometime prior to Daisy's sixteenth birthday in June 2019, she returned to her mother and stepfather's home in Springfield, Massachusetts. She spent her birthday there but remained in contact with Pires. Around this time, Pires and Daisy both professed their love for each other, and Daisy told him that

she did not want to live at home anymore and that she wanted to be with him instead. Ultimately, Daisy fled home and went to live with Pires at his mother's house.

While living with Daisy at his mother's house, Pires organized Daisy's first instance of commercial sex. As Daisy explained it, Pires -- jobless and wanting money -- looked at Daisy's body and told her that he needed her "to sell that thing." Shortly thereafter, Pires planned for Daisy to engage in commercial sex with his uncle.

Pires followed through with the plan. Pires's uncle met him and Daisy outside of Pires's mother's house. After Pires and his uncle conversed in Cape Verdean Creole, Pires directed Daisy to get in his uncle's car. Pires's uncle drove off, parked the car, climbed into the backseat, and engaged in oral and vaginal sex with Daisy. They then returned to Pires's mother's home, where Pires was waiting outside to receive money from his uncle. This encounter "made [Daisy] feel really shitty." Still, Pires indicated to Daisy that he wanted her to "do another one." Daisy responded that she did not want to do so because she was not comfortable with it. Around that time, however, Daisy also described the MegaPersonals website to Pires, and they created an account on MegaPersonals.

Pires and Daisy lasted only about a week and a half at Pires's mother's house before they were kicked out for not paying

- 7 -

rent.  Pires did not have a job, nor anywhere else to stay, so he and Daisy spent their nights sleeping in cars in a parking lot.

At some point in July 2019, Pires's friend, Eli, offered Pires and Daisy a place to stay in Norwood, Massachusetts.  Daisy knew Eli because he often was at Pires's mother's house.  And Eli knew Daisy was a runaway minor because he saw her missing person's report.  Notwithstanding this knowledge, Eli offered to house her and Pires at Burke's apartment.  Burke, Eli said to Pires and Daisy, was "a crack head" and "his bitch" who "would do anything for him."  Pires told Daisy that Burke's apartment would be a better place for Daisy to sell her body.

Pires and Eli brought Daisy to Burke's home.  Before arriving, Eli warned Pires and Daisy that Burke could not know Daisy's real identity or age.  So, together, Daisy, Pires, and Eli concocted fake identities for Daisy and Pires: Daisy claimed to be a twenty-one-year-old woman named Melissa, and Pires went by Mikey.

For about two weeks, Pires, Daisy, Eli, and Burke all lived in Burke's one-bedroom apartment.  Just after moving in, Pires and Daisy began orchestrating commercial-sex transactions. Pires and Daisy posted advertisements on the MegaPersonals accounts they had created, offering Daisy for commercial sex.  Both Pires and Daisy communicated with customers, using their respective phones as well as Burke's.  Daisy engaged in commercial sex with customers primarily in Burke's bedroom and, on some

occasions, multiple times a day.[2]  The men would pay Daisy afterward, and she would give the money to Pires.  Eli and Pires were not always at Burke's apartment when Daisy engaged in commercial sex; however, they each were there during some of the commercial-sex transactions.  In fact, Pires told Daisy she could not be too loud during commercial sex because "[h]e would get jealous" if he heard her and thought she "was actually enjoying it."

## B. Burke's Testimony

Burke also testified about her involvement in the relevant events.  At the outset, she explained her relationship with Eli.  After meeting at a bar, she and Eli quickly developed a relationship.  It started out with Eli providing Burke free drugs; specifically, crack cocaine.  Burke, at the time, suffered from a substance-use disorder, taking approximately "five hits [of crack cocaine] a day."  Eventually, her relationship with Eli became sexual.  And after about a month of knowing Burke, Eli started to bring his friends to Burke's apartment to "[s]moke a lot of [marijuana]."  Eli did this two-to-three days per week.

One day, Eli showed up to Burke's apartment with his friend "Mikey" (i.e., Pires).  They asked Burke if Pires and his

---

[2] Daisy testified that she and Pires slept on a mattress in Burke's room.  Burke confirmed this arrangement, later testifying that Pires and Daisy slept in her room and that she slept on her couch.

friend could stay at Burke's apartment. After Burke consented, Pires brought in "Melissa" (i.e., Daisy).

For approximately two weeks, Pires, Daisy, and Eli stayed with Burke, during which time Burke learned that Daisy was Pires's girlfriend. Pires told Burke as much, and moreover, he and Daisy were intimate in front of Burke. Burke also testified that she could hear them having sex because it was a small apartment.

At some point, Burke started letting Pires and Daisy use her phone, which they did "[a] lot." They consistently answered text messages and phone calls using Burke's phone. Burke grew suspicious that they were using the phone to engage in commercial sex, and she confirmed that suspicion when Daisy had sex with a man after stating that she "had an appointment." Burke further testified that when Daisy engaged in commercial sex, Pires generally would leave the apartment and return just after Daisy received the money from the customer. Burke said that Daisy never kept the money; instead, she always handed it over to Pires. Pires was noticeably insistent with Daisy, Burke indicated, often demanding that Daisy see more customers to make more money for him. Although Burke admitted that she did not hear the details of conversations between Pires and Eli regarding sex trafficking, she said that "Eli knew everything that was going on, because it was

just -- when you're in a small house, and that's what's going on, everybody in the house knows about it."

Burke confessed that failing to intervene to stop the commercial sex is one of her biggest regrets. She failed to do so, however, because "[she] was so drugged up" on drugs that Eli gave her, for the most part, for free.

## C. Analysis

We review de novo a preserved challenge to the sufficiency of the evidence.[3] Buoi, 84 F.4th at 37. In so doing, we "examine the evidence, both direct and circumstantial, in the light most favorable to the prosecution and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged count or crime." United States v. Santonastaso, 100 F.4th 62, 68 (1st Cir. 2024) (quoting United States v. Cruz-Díaz, 550 F.3d 169, 172 n.3 (1st Cir. 2008)). But "we do not view each piece of evidence separately, re-weigh the evidence, or second-guess the jury's credibility calls." United States v. Minor, 63 F.4th 112, 125 (1st Cir. 2023) (quoting United States v. Acevedo-Hernández, 898 F.3d 150, 161 (1st Cir. 2018)). "[W]e will reverse only if the verdict is irrational." Buoi, 84 F.4th at 38 (alteration in

---

[3] The government concedes that Pires preserved his challenge to the sufficiency of the evidence.

- 11 -

original) (quoting <u>United States</u> v. <u>Connolly</u>, 341 F.3d 16, 22 (1st Cir. 2003)).

The thrust of Pires's argument as it relates to a conspiracy with Eli is that there was insufficient evidence that he reached an agreement with Eli to commit sex trafficking of Daisy. Pires contends, rather, that the government has proven no more than the fact that Eli gave his homeless friend (<u>i.e.</u>, Pires) a place to live, knowing that Pires was sex trafficking Daisy but not necessarily intending it to happen. We disagree. There was sufficient evidence to allow a rational factfinder to conclude that Pires and Eli conspired to violate 18 U.S.C. § 1591(a)(1).

We begin with conspiracy principles. To prove a conspiracy, "the government must show beyond a reasonable doubt that the defendant and one or more coconspirators intended to agree and . . . to commit the substantive criminal offense which was the object of their unlawful agreement." <u>United States</u> v. <u>Perrotta</u>, 289 F.3d 155, 160 (1st Cir. 2002) (quoting <u>United States</u> v. <u>Escobar-de-Jesus</u>, 187 F.3d 148, 175 (1st Cir. 1999)). "[T]he fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'" <u>Ocasio</u> v. <u>United States</u>, 578 U.S. 282, 287 (2016) (second alteration in original) (quoting <u>Salinas</u> v. <u>United States</u>, 522 U.S. 52, 65 (1997)).

The substantive underlying offense here -- sex trafficking of a minor in violation of § 1591(a)(1) -- requires proof in relevant part that someone: (1) knowingly (2) by means of "interstate or foreign commerce," (3) "recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], advertise[d], maintain[ed], patronize[d], or solicit[ed] by any means a person," (4) "knowing . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act."[4]

Construed in the light most favorable to the verdict, the evidence sufficed to establish that Eli conspired with Pires to violate § 1591(a)(1) by knowingly "harbor[ing]" and "maintain[ing]" Daisy with knowledge that she was under eighteen years old and would be caused to engage in commercial sex. For one thing, Pires conceded in his opening brief that "[t]here was evidence that Eli knew that . . . Pires was trafficking Daisy and that Eli helped them find a place to stay knowing that they would continue these activities." And the record no doubt supports that concession: Daisy testified that Eli saw her missing person's notice, which contained her age; she testified that Eli was sometimes there when she engaged in commercial sex; and Burke

---

[4] We evaluate the sufficiency of the evidence against the statutory elements, not the jury instructions. See Musacchio v. United States, 577 U.S. 237, 243 (2016) ("We hold that . . . a sufficiency challenge should be assessed against the elements of the charged crime . . . .").

testified that her apartment (where Daisy engaged in commercial sex) was small enough that everyone inside it knew that Daisy was engaging in commercial sex.  What is more, evidence in the record indicated that Eli's role went well beyond merely providing a friend, Pires, with shelter: (1) Eli ideated the plan to move Pires and Daisy to Burke's apartment; (2) he instructed Pires and Daisy to conceal their identities from Burke, including by using fake names and a fake age for Daisy;[5] (3) after Pires talked with Eli about the plan, Pires told Daisy that Burke's house would be a better place to sell her body; (4) after Pires and Daisy moved into Burke's small, one-bedroom apartment, Eli maintained the status quo by continuing to supply Burke with drugs; and (5) after Burke and Daisy were brought to the Norwood PD station, Eli texted Burke "you fuck me over . . . every[]time."

Given that evidence, a jury could reasonably have inferred that Eli tacitly agreed with Pires to harbor or maintain Daisy knowing that she would engage in commercial sex.  See United States v. Alejandro-Montañez, 778 F.3d 352, 358 (1st Cir. 2015) ("The agreement . . . may consist of no more than a tacit

---

[5] Pires argues that "[t]he fake name and age could have been to conceal Daisy's status as a minor and a runaway," not because, as the government would have it, Eli was trying to prevent Burke from finding out that Pires was sex trafficking a minor.  That is an alternative explanation, to be sure, but in reviewing the sufficiency of the evidence, we draw all reasonable inferences in favor of the jury's verdict.  See Muñoz-Martinez, 79 F.4th at 50.

understanding." (citation omitted)); see also United States v. Guzman-Ortiz, 975 F.3d 43, 48 (1st Cir. 2020) ("[D]ue to the clandestine nature of criminal conspiracies, the law recognizes that the illegal agreement may be either express or tacit and that a common purpose and plan may be inferred from a development and collocation of circumstance." (quotation marks and citation omitted)).

We are unconvinced by Pires's arguments to the contrary. First, Pires contends that Eli's mere knowledge of, or proximity to, the illegal conduct is not by itself sufficient to establish a conspiracy. In Pires's view, the government had to prove that Eli acted with specific intent to cause Daisy to engage in commercial sex. But even if we accept that contention (about which we express no opinion), there was enough evidence, construed in the light most favorable to the verdict, to demonstrate that Eli did, in fact, have such an intent.

We have long recognized that in cases such as this, where the government's evidence of a conspiratorial agreement rests largely on circumstantial evidence, "[t]he attendant circumstances tell the tale -- and the culpability of a[n alleged coconspirator's] presence hinges upon whether the circumstances fairly imply participatory involvement." Guzman-Ortiz, 975 F.3d at 48 (quoting United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993)). Far from incidental, Eli's involvement here was, as

we outline above, instrumental, "undercut[ting Pires's] claim that the evidence showed only [Eli's] 'mere presence' at a conspiratorial event." United States v. Vázquez Rijos, 119 F.4th 94, 101 (1st Cir. 2024); cf. Guzman-Ortiz, 975 F.3d at 48. Simply put, the jury was permitted to infer that Eli would not have engaged in the aforementioned conduct unless he was conspiring with Pires.[6] See United States v. Flanders, 752 F.3d 1317, 1330 (11th Cir. 2014) (holding that "the jury could infer that [a coconspirator] would not have known to [engage in certain conduct] unless he were in on the [scheme]"); see also United States v. Llinas, 373 F.3d 26, 32 (1st Cir. 2004) ("[A] jury is free to rely on its common sense and may infer that criminal conspirators do not involve innocent persons at critical stages of a [crime]." (citation omitted)).

Second, Pires says there was no evidence suggesting that Eli established his relationship with Burke for the sole or specific purpose of harboring Daisy. Pires points to Eli and Burke's preexisting arrangement: they knew each other months

---

[6] Both in his briefing and at oral argument, Pires points to the lack of direct evidence showing Eli's intent to join the conspiracy. But we are unmoved by this argument because circumstantial evidence alone may prove a conspiratorial agreement. See Guzman-Ortiz, 975 F.3d at 48; see also United States v. Adorno-Molina, 774 F.3d 116, 121 (1st Cir. 2014) ("[S]pecific intent 'may be established through circumstantial evidence alone.'" (quoting United States v. Cortés-Cabán, 691 F.3d 1, 15 (1st Cir. 2012))).

before Pires stayed at her apartment, and throughout that time, Eli provided Burke drugs in exchange for sex and a place for him and his friends to hang out. The record evidence, however, indicated that this preexisting relationship was precisely the reason why Eli felt confident about offering Burke's abode to Pires and Daisy in the first place. That is, Eli viewed Burke as "a crack head" and "his bitch" who "would do anything for him," so he, the jury could have inferred, felt confident that he and Pires could harbor Daisy there. Pires cites no authority to support the contention that, to conspire, Eli would have needed to change his behavior or increase payments to Burke for the specific purpose of harboring Daisy. Nor do we see good reason to require any such change in the terms of his preexisting affairs.

Third, Pires attempts to distinguish Eli's involvement from other cases in which courts have found sufficient evidence of conspiracies. Specifically, Pires cites a slew of out-of-circuit cases, arguing that the government failed to show evidence that Eli "help[ed] convince Daisy to participate in sex work, photograph Daisy, post advertisements, communicate with potential buyers, collect money from Daisy or . . . Pires, engage in other sex trafficking, or communicate with Daisy or . . . Pires about sex trafficking." See, e.g., United States v. Coulter, 57 F.4th 1168, 1180 (10th Cir. 2023); United States v. Wysinger, 64 F.4th 207, 213-14 (4th Cir. 2023); United States v. Mack, 808 F.3d 1074, 1081

(6th Cir. 2015); Flanders, 752 F.3d at 1330; United States v. Walsh, 827 F. App'x 30, 33 (2d Cir. 2020) (summary order).[7]  As we note above, however, § 1591(a)(1) criminalizes a host of conduct -- including "recruit[ing], entic[ing], harbor[ing], transport[ing], provid[ing], obtain[ing], advertis[ing], maintain[ing], patroniz[ing], or solicit[ing]."  And liability attaches to any of the acts in that disjunctive list of verbs. See United States v. Brooks, 610 F.3d 1186, 1197 (9th Cir. 2010) (rejecting defendant's argument that "there was no evidence that he persuaded or enticed [the minors] to become involved in prostitution" because the jury could find that defendant "knowingly transported, as well as harbored, the girls").

---

[7] At oral argument, Pires focused on the Fourth Circuit's opinion vacating a conspiracy conviction in United States v. McMillan, 813 F. App'x 846 (4th Cir. 2020).  But material factual distinctions render the decision inapposite.  In McMillan, the government put forth evidence to show that (1) in May 2014, a prostitute left one pimp-defendant for another pimp-defendant; (2) at a later date, one defendant sometimes gave rides with no documented relationship to sex trafficking to the other one; and (3) after one defendant was arrested, the other defendant contacted him on Facebook allegedly to assist him in escaping jail. Id. at 849-50.  The Fourth Circuit vacated the conviction because "there [wa]s neither direct nor circumstantial evidence sufficient to prove that Miller knew Jackson in May 2014 and intentionally released B.E. to him, that the rides Miller admitted to giving Jackson in the summer of 2014 were in support of Jackson's sex-trafficking activities, or that Miller and Jackson's Facebook correspondence in September 2014 was part of a plot to stymie the police investigation." Id. at 850.  Here, conversely, the evidence the government laid out clearly established that Pires and Eli had a relationship that pre-dated the sex trafficking of Daisy, and that Eli's introduction and vouching secured the place needed for the trafficking operation.

Likewise, here, the jury here could reasonably have found that Eli knowingly harbored and maintained Daisy. It is thus of little import that the cases Pires cites involve defendants who engaged in different conduct prohibited by § 1591(a)(1).

Fourth, Pires points to our decision in United States v. Canty, asserting that the government failed to establish interdependence between him and Eli. See 37 F.4th 775, 795 (1st Cir. 2022). That argument misses the mark. We assess interdependence only to discern whether multiple actors' conduct evinces "a single general agreement," United States v. Ramos-Baez, 86 F.4th 28, 51 (1st Cir. 2023) (quoting United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999)), to participate in a "single overarching conspiracy" rather than "individual agreements with various actors at different times," Canty, 37 F.4th at 793. We need not engage in that inquiry here because, for the reasons we give above, the evidence sufficiently demonstrated Eli's tacit agreement to conspire specifically with Pires.[8]

## IV. EVIDENTIARY CHALLENGES

We next turn to Pires's contention that the admission of certain expert testimony corrupted the jury's verdict. Before

---

[8] Having identified sufficient evidence to establish a conspiracy between Pires and Eli, we decline to address Pires's challenge to the evidence underlying the conspiracy between Pires and his uncle. See Pena, 24 F.4th at 74.

- 19 -

reaching the merits, we must determine whether Pires preserved his objections.  To do so, we recount the relevant history.

## A. SA Garrabrant's Testimony and Pires's Objections

Prior to trial, the government indicated that it would offer SA Garrabrant as an expert on:

(1) The types of victims that are commonly recruited by pimps to engage in commercial sex acts;

(2) The typical means sex traffickers use to target, recruit, manipulate, and maintain victims;

(3) The [c]ommon ways that sex traffickers maintain control over victims' actions and to prevent victims from leaving the relationship;

(4) The common reactions of victims of sex trafficking to the abuse;

(5) The logistics of a sex trafficking operation; [and]

(6) Terms utilized in the sex trafficking industry.

Pires filed a motion in limine objecting to the first four categories of anticipated testimony.  In his motion, Pires argued that such testimony was irrelevant under Federal Rule of Evidence ("Rule") 401 and thus unhelpful to the jury under Rule 702.  He pressed, too, for exclusion of the testimony under Rule 403 because, he believed, the anticipated testimony amounted to "highly prejudicial profiling," which "may in fact touch on the evidence in [Pires's] case," and would "thus encourag[e] the factfinder to infer guilt merely because his case may have consistencies with other cases of this nature."

- 20 -

During trial, but before SA Garrabrant took the stand, Pires renewed his objections. He stated, in relevant part:

> I'll just refresh my objection for the record. . . . The testimony that I'm primarily concerned about is testimony about common or typical traits of victims or common or typical traits of traffickers. . . .
>
> So for the reasons I expressed in my brief, we would object to that. We think that there's no relevance to it. This is an individual case. This is about the evidence as to this victim and Mr. Pires. What might happen in other cases is not relevant, has no tendency to prove anything with respect to this case, and we foresee significant danger of undue prejudice, in that it both profiled the victim, implying that there are -- that alleged victims who may have certain traits are victims, and defendants who have certain traits or characteristics are traffickers. And for those reasons, we're objecting to testimony along those lines.

Then and there, the district court rejected Pires's objections. It stated that the anticipated testimony would be helpful to the jury in general and was different in kind from the testimony described in the "profiling" cases Pires had cited. The district court did, however, express concern about the government's request to ask SA Garrabrant hypothetical questions. To allay those concerns, the government indicated that it would not ask such questions without first seeking the court's approval at sidebar. The district court then stated that Pires's "rights [we]re preserved."

Not long after that colloquy, SA Garrabrant took the stand.  We summarize the portions of his testimony relevant to the instant appeal.

At the outset, SA Garrabrant answered questions related to his qualifications to testify as an expert.  Pires had no objection to SA Garrabrant's qualifications, but he reiterated his "objection to the subject matter that we discussed previously." The district court again overruled the objection.  SA Garrabrant then briefly explained that he had no familiarity with the case: he did not review any reports related to the investigation, did not speak to any witnesses, did not know the concerned individuals' names, and was not in the courtroom while other witnesses testified.  He confirmed that he was "basically [t]here . . . to testify blindly about what [he] kn[e]w about the commercial sex trafficking trade."

Turning to the substance, SA Garrabrant described common characteristics among the sex-trafficking victims that he had interviewed.  He opined that victims of sex trafficking are often vulnerable due to trauma, mental health issues, substance-use disorders, or a combination of all three.  He said that those same characteristics are common in minor victims.  He further stated that minors who "go through child services" or are "in and out of shelters," are "very vulnerable" to sex trafficking.  He explained

that instability -- e.g., a lack of shelter, food, and necessities -- "make[s] kids more vulnerable."

SA Garrabrant then shifted to delineating typical patterns of pimps. Pimps, he noted, are typically "super charismatic" individuals who exploit the vulnerabilities of their victims, employing a grooming process to attract their victims. He said that pimps typically begin the grooming process by establishing strong relationships with the victims. For instance, he elaborated, pimps might give victims a place to stay, buy them food and clothes, or supply them with drugs to exploit substance-use disorders.

SA Garrabrant opined, however, that the grooming process differs based on the type of pimp. He stated that "finesse pimping" typically involves a pimp with "great powers of persuasion." Such pimps use persuasive tactics "to both recruit and keep girls in the stable." By "stable," SA Garrabrant clarified, he "mean[t] a group of girls -- like if you have three girls working for the same pimp, that's called his stable."

He then contrasted finesse pimps with "gorilla pimps." He explained that gorilla pimps "use a lot of finesse to get their girls and recruit them," but unlike finesse pimps, gorilla pimps "can be incredibly violent." Gorilla pimps, he added, often "steal girls from other pimps, [and] they're more likely to use . . . physically assaultive behavior." SA Garrabrant offered

an example: "If a girl tries to leave, [a gorilla] pimp [is] going to be extremely physically assaultive," by in some cases, "us[ing] extreme forms of physical and sexual torture and abuse." He explained that finesse pimps and gorilla pimps are in that way "very different."

Homing in on finesse pimping, SA Garrabrant underscored a common dynamic between finesse pimps and their victims: the victims often view the pimps as their "boyfriend[s]." Pimps find this dynamic important because it establishes trust between them and the victims. And so, he emphasized, when the police show up, victims are less likely to "tell on [their] boyfriend[s]."

SA Garrabrant then described the purpose of the grooming process. After having established a strong relationship with the victims, finesse pimps typically persuade them to begin engaging in commercial sex. "[G]etting them to that point," SA Garrabrant stated, is the goal of the grooming process. Once that "first date"[9] occurs, in SA Garrabrant's experience, a pimp has a stronger grasp on the victim. As SA Garrabrant put it, "a pimp will tell you . . . [,] once that first date is done, [the victim is] mine."

After that, SA Garrabrant indicated, sex traffickers commonly focus on maintaining control over the victims. Generally,

---

[9] SA Garrabrant defined a "date" as a commercial sex transaction, specifically, "the act of the female meeting the male for a sexual engagement."

they give victims "street name[s]" and cut off the victims from their support systems, which increases victims' reliance on traffickers. In addition, even though the victims engage in commercial sex, SA Garrabrant said, pimps continue to reinforce that they are the victims' boyfriends, by, for example, continuing to have intimate sexual relationships with the victims. In so doing, SA Garrabrant explained, the pimps attempt to create "completely dependent" victims, making "it[] really, really hard [for the victims] to leave."

Next, SA Garrabrant explained how pimps regulate the commercial-sex trade. Pimps, he said, often control the finances. "[A] lot of pimps," he added, "will strip search girls and make sure they're not hiding any money," and there are "repercussions" "if [the victims] get caught hiding money." The pimps also often set the rates customers must pay in exchange for commercial sex. Moreover, SA Garrabrant testified, pimps often prohibit victims from engaging in commercial sex with Black men. SA Garrabrant stated that "sometimes [he]'ll see in an ad[vertisement that] the girl will post 'no black men.'" That is because, SA Garrabrant elaborated, it is common for pimps to attempt to steal sex workers from other pimps, and pimps perceive minority men as more of a threat to steal the victims.

SA Garrabrant finally testified about the common reactions of victims after they have been rescued or interviewed

by law enforcement. Victims "very rare[ly]" incriminate their pimps immediately after they have been rescued by law enforcement. This hesitance to confide in law enforcement, SA Garrabrant opined, is a result of the pimps' efforts to reinforce the victims' reliance on them.

Pires did not contemporaneously object to any of SA Garrabrant's testimony.

### B. Preservation

On appeal, Pires takes aim at two buckets of SA Garrabrant's testimony. The first bucket relates to SA Garrabrant's testimony about typical patterns used by sex traffickers and typical dynamics between sex traffickers and their victims (we refer to this as "typical-patterns-and-dynamics testimony"). The second bucket concerns SA Garrabrant's testimony regarding "gorilla pimps," or pimps who use violence and abuse to coerce and control sex workers (we call this the "gorilla-pimp testimony").

The government does not dispute that Pires preserved his objections as to the typical-patterns-and-dynamics testimony, so the challenge is preserved. See United States v. Encarnación-Ruiz, 787 F.3d 581, 586 (1st Cir. 2015) ("When the government fails to request plain error review, we, and many of our sister circuits, review the claim under the standard of review that is applied when the issue is properly preserved below." (collecting cases)). But

the parties do spar over whether Pires preserved his challenge to the gorilla-pimp testimony. For its part, the government argues that Pires's pre-testimony objections were different from the arguments he now presses. Pires counters that he preserved that argument when he objected -- before trial and at trial before SA Garrabrant offered any expert testimony -- to the general relevance of SA Garrabrant's anticipated testimony.

Ordinarily, a defendant must timely -- and specifically -- raise an evidentiary objection to preserve his or her appellate rights. See Fed. R. Evid. 103; see also United States v. Encarnacion, 26 F.4th 490, 503-04 (1st Cir. 2022) ("Ordinarily, a defendant must object to particular evidence at trial in order to preserve his appellate rights."). Thus, determining whether a party preserved a claim for appeal is often a straightforward task: the party either objected below or didn't. See, e.g., United States v. Pérez-Greaux, 83 F.4th 1, 31 (1st Cir. 2023). We do, however, permit a defendant to raise an evidentiary "objection before trial by a motion in limine." Encarnacion, 26 F.4th at 504. And if "the district court's rejection of the defendant's position is unconditional, the defendant's objection may be deemed preserved even if not raised again at trial." Id. But when the ruling is "preliminary, conditional, or 'tentative'" and "'clearly invites the party to offer the evidence at trial,' . . . the [defendant] has an obligation to raise [the

objection] again to preserve the claim." United States v. Grullon, 996 F.3d 21, 30-31 (1st Cir. 2021) (quoting United States v. Almeida, 748 F.3d 41, 50 (1st Cir. 2014)).  Critically, we have said -- indeed, "emphasize[d]" -- that Rule 103 places the onus on the objecting party "to clarify whether an in limine or other evidentiary ruling is definitive when there is doubt on that point."  United States v. Takesian, 945 F.3d 553, 562 (1st Cir. 2019) (quoting Crowe v. Bolduc, 334 F.3d 124, 133 (1st Cir. 2003)).

Here, we hold that Pires failed to preserve his claim of error as to the gorilla-pimp testimony for two independent reasons. First, Pires nowhere "argue[s] that th[e] rulings [on the motion in limine] were final rather than tentative, so [his] failure to renew his objection at trial triggers plain error review on appeal."  Almeida, 748 F.3d at 50.  Second, even if unconditional as to SA Garrabrant's anticipated testimony, Pires offered only a general relevance objection that does not suffice to cover the specific challenges he raises on appeal.

We expand on the latter.  Our starting point is our discussion in United States v. Rivera Rangel, where we aptly stated:

> The fact that a party has preserved an objection does not mean that, on appeal, the party can raise any conceivable ground in support of that objection.  In the context of a ruling admitting evidence, we have explained that a "lack of specificity bars the party aggrieved by the admission of the evidence from raising more particularized points for the first time on

- 28 -

appeal." . . . [A] contrary holding would enable a party to retrench after an adverse jury verdict and ask an appellate court to view the trial judge's evidentiary rulings through a new and different lens. This sort of second-guessing is antithetic to the core purpose of procedural default rules.

466 F.3d 158, 162 (1st Cir. 2006) (citation omitted).

That rationale is determinative here. Recall Pires's pre-trial objections. In his motion in limine, he explained that he was objecting to four broad categories of anticipated testimony. He emphasized his "grave[] concern[] that SA Garrabrant's 'generalized' testimony may in fact touch on the evidence in his case, thus encouraging the factfinder to infer guilt merely because his case may have consistencies with other cases of this nature." (Emphasis added.) During trial, but before SA Garrabrant testified, Pires twice reiterated his objection, noting that he was "primarily concerned about [the] testimony about common or typical traits of victims or common or typical traits of traffickers" because he "fores[aw] significant danger of undue prejudice, in that it both profiled the victim, implying that there are -- that alleged victims who may have certain traits are victims, and defendants who have certain traits or characteristics are traffickers." Nowhere did Pires object that SA Garrabrant's testimony would impermissibly touch on conduct in which Pires did not engage. Overruling the objection, the district court stated: "I don't think it's the kind of profiling that the cases [Pires]

- 29 -

cited talked about. I think it's different. I think it will be helpful to the jury in general." Shortly thereafter, the district court stated, "Your rights are preserved, by the way."

To the extent Pires interpreted the district court's ruling as definitively resolving any future relevance objection, he is wrong. Sure, the district court said that Pires's rights were preserved. But the district court reached its decision before SA Garrabrant offered any expert testimony and after having heard only Pires's general relevance objection and his more specific objections about the profiling nature of the anticipated testimony. So, when the district court qualified its pre-testimony ruling that it did not think the anticipated testimony constituted profiling and that the testimony "w[ould] be helpful to the jury in general" (emphasis added), the court was, at most, holding that the anticipated testimony would not constitute profiling and the four objected-to categories of anticipated testimony generally fit the case. Nothing more. Far from ordaining as relevant all of SA Garrabrant's testimony to follow, that ruling left to Pires the duty to level specific objections to otherwise objectionable testimony elicited at trial in accordance with Rule 103. Plainly stated, even if the district court's ruling preserved Pires's objections on some grounds, Pires's general and conclusory invocation of the word "relevance" in his pre-testimony objection did not preserve his claim as to the gorilla-pimp testimony. See

- 30 -

id. ("[A] 'lack of specificity bars the party aggrieved by the admission of the evidence from raising more particularized points for the first time on appeal.'" (citation omitted)).

Similar to what we said in Rivera Rangel, see id., a contrary holding here would eviscerate Rule 103(a) and its underlying purposes: "to allow the judge to avoid error" at trial and "get the ruling right," United States v. O'Brien, 435 F.3d 36, 39 (1st Cir. 2006), and to permit the government to "cure[] the objection by introducing" the evidence in an appropriate manner, United States v. Bailey, 270 F.3d 83, 87-88 (1st Cir. 2001). Moreover, such a rule would "increase the heavy burdens already imposed on trial judges in criminal cases," who would have to sua sponte anticipate any potential relevance issues without the aid of a contemporaneous objection. United States v. De La Cruz, 902 F.2d 121, 124 (1st Cir. 1990) (citation omitted). We refuse to approve such a practice.

Therefore, unlike Pires's preserved objection to the typical-patterns-and-dynamics testimony, Pires's objection to the gorilla-pimp testimony is unpreserved. Turning now to the substance of Pires's evidentiary challenges, we accordingly review his challenge to the typical-patterns-and-dynamics testimony for abuse of discretion and his challenge to the gorilla-pimp testimony for plain error.

### C. Typical-Patterns-and-Dynamics Testimony

We first consider Pires's objections as outlined in his motion in limine. Specifically, Pires argues that the typical-patterns-and-dynamics testimony (1) was inadmissible under Rules 702 and 401; (2) amounted to impermissible "profiling" testimony; and (3) improperly "bolster[ed]" the credibility of certain witnesses.

As we note above, because the government did not argue Pires failed to preserve this objection, we review for abuse of discretion. See Encarnación-Ruiz, 787 F.3d at 586. Under that standard, we afford broad discretion to the "district judge, who sees and hears the challenged evidence first hand in the context of the overall trial." United States v. Gordon, 954 F.3d 315, 327 (1st Cir. 2020) (quoting United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994)). We will overturn the district court's evidentiary determination "only if it represents a manifest abuse of discretion." Id.

### 1. Objection Under Rules 702 and 401

Invoking Rules 702 and 401, Pires argues that the district court should have prohibited SA Garrabrant from testifying about typical sex-trafficking patterns and common dynamics between sex traffickers and their victims. According to Pires, that testimony did not help the jury understand an opaque industry and was irrelevant. Although we have not yet had occasion

to decide whether sex-trafficking-pattern testimony, like SA Garrabrant's, is permissible under Rule 702, our precedent inevitably leads to the conclusion that it is.

The admissibility of expert testimony is governed by Rule 702, which provided at the time of Pires's trial:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011);[10] see also Fed. R. Evid. 401 (the general relevance rule). The Supreme Court has interpreted Rule 702 as "assign[ing] a 'gatekeeping role for the judge' to determine that 'an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Martínez v. United States, 33 F.4th 20, 24 (1st Cir. 2022) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)). We do not, however,

---

[10] As we noted in D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc., Rule 702 was amended in December 2023. 111 F.4th 125, 140 n.11 (1st Cir. 2024). Because that amendment occurred after Pires's trial, "we apply the version of Rule 702 in effect at the time of the . . . trial." Id.

permit expert testimony "when its 'subject . . . is well within the bounds of a jury's ordinary experience' and so it 'has little probative value' but 'might unduly influence the jury's own assessment of the inference that is being urged.'" Gordon, 954 F.3d at 327 (quoting Montas, 41 F.3d at 784).

To that end, consider first whether the sex-trafficking industry and methods used by sex traffickers are beyond the ken of laypeople. District courts making that determination are guided by a "common sense inquiry." Montas, 41 F.3d at 783 (citation omitted). Common sense, along with our precedent, dictates that the intricacies of the sex-trafficking industry and the typical dynamics between pimps and prostitutes fall well outside the understanding of the average juror.

For decades in our circuit, "[w]e have admitted expert testimony regarding the operation of criminal schemes and activities in a variety of contexts." Gordon, 954 F.3d at 327 (quoting Montas, 41 F.3d at 783). We have held to be beyond the ken of an average juror expert testimony about the "typical methods of drug dealers," United States v. Monell, 801 F.3d 34, 45 (1st Cir. 2015); "the nature of narcotics trafficking by vessels," United States v. Peña-Santo, 809 F.3d 686, 694-95 (1st Cir. 2015); and "certain roles in . . . [a] crime family's 'extensive criminal organization,'" Montas, 41 F.3d 783 (quoting United States v. Angiulo, 897 F.2d 1169, 1189 (1st Cir. 1990)). We have said the

same for expert testimony regarding "the behavioral reactions of abuse victims." United States v. Alzanki, 54 F.3d 994, 1006 (1st Cir. 1995). More recently, we explained that the average juror "would [not] be familiar with prototypical grooming behavior by an individual seeking out sex with minors." United States v. Soler-Montalvo, 44 F.4th 1, 17 (1st Cir. 2022). SA Garrabrant's typical-patterns-and-dynamics testimony is no exception; the testimony falls outside the common knowledge of the average layperson.

Such testimony was plainly relevant, too. It, among other things, described the sex-trafficking industry and illuminated how Pires's romantic relationship with Daisy "could be part of a seduction technique." United States v. Romero, 189 F.3d 576, 585 (7th Cir. 1999); cf. also Soler-Montalvo, 44 F.4th at 15, 16-17 (calling expert testimony about "patterns of online predators" "highly relevant to and probative of the key issue in the case" where it, conversely, "sought to explain . . . how seemingly sinister conduct could be part of innocent sexual fantasy"). It, moreover, may have helped the jury assess Daisy's credibility, which Pires sought to undermine throughout trial "by pointing out the inconsistencies in [her] testimon[y], and by intimating that [she] would not have remained with [Pires] if he had mistreated [her] as [she] claimed." United States v. Anderson, 560 F.3d 275, 281-82 (5th Cir. 2009) (quoting United States v.

Anderson, 851 F.2d 384, 393 (D.C. Cir. 1988)); see also United States v. Taylor, 239 F.3d 994, 998 (9th Cir. 2001) (explaining the jury might be "in the dark" about pimp-victim relationships and thus "may be unprepared to assess the veracity of an alleged pimp, prostitute, or other witness testifying about prostitution"); United States v. Rivera, No. 22-2780, 2024 WL 2813548, at *2 (2d Cir. June 3, 2024) (summary order) (approving expert testimony about "trauma bonding" because it "would help jurors understand . . . why a sex trafficking victim might express affection for their trafficker").

The overwhelming weight of authority from our sister circuits further supports the admissibility of such expert testimony as well. See, e.g., United States v. Robinson, 993 F.3d 839, 849 (10th Cir. 2021) (special agent testimony about "pimping and prostitution culture" "provided a basis on which the jury could infer that Defendant recruited a vulnerable girl seeking structure and stability in her life"); United States v. Young, 955 F.3d 608, 615 (7th Cir. 2020) (testimony that "defined key terms and explained common sex-trafficking dynamics"); United States v. Szczerba, 897 F.3d 929, 939-40 (8th Cir. 2018) (testimony regarding "what pimps and prostitutes 'typically' do," including testimony about "how pimps recruit, control, coerce, and advertise prostitutes" and "practices [pimps] commonly use[]"); Brooks, 610 F.3d at 1196 (testimony about, among other things, pimps' methods

of "isolat[ing] new prostitutes from familiar areas"); Anderson, 560 F.3d at 281 (testimony about "typical characteristics of adolescent prostitutes and . . . the behavior of pimps"); Taylor, 239 F.3d at 998 (similar); Anderson, 851 F.2d at 393-94 (similar); United States v. Jenkins, No. 21-4447, 2024 WL 4891180, at *6 (4th Cir. Nov. 26, 2024) (broad testimony "about the 'typical human trafficking experiences of its victims and the common behaviors of traffickers'" (citations omitted)); United States v. Warren, 774 F. App'x 778, 782 (4th Cir. 2019) (per curiam) (similar).

Given our precedent and that of our sister circuits, we hold that the district court did not abuse its discretion when it denied Pires's motion in limine to prohibit SA Garrabrant's typical-patterns-and-dynamics testimony.

## 2. Profiling Objection

We turn next to Pires's claim that SA Garrabrant's testimony amounted to impermissible "profiling." By that, Pires means that SA Garrabrant's typical-patterns-and-dynamics testimony improperly "encouraged the jury to convict [Pires] because the conduct described by witnesses mirrored what SA Garrabrant described as 'typical' sex trafficking." We are unpersuaded.

At the outset, we concur with the D.C. Circuit that "the 'profile' label is not helpful in distinguishing admissible from inadmissible expert testimony." United States v. Long, 328 F.3d 655, 666 (D.C. Cir. 2003), abrogation on other grounds recognized

- 37 -

by United States v. Mohammed, 89 F.4th 158, 164 (D.C. Cir. 2023). Instead, courts must look to "the Federal Rules of Evidence and the purpose for which the evidence is offered: whether it is designed improperly to illuminate the defendant's character or propensity to engage in criminal activity, or whether instead it seeks to aid the jury in understanding a pattern of behavior beyond its ken." Id.

One problem: Pires does not cite a specific Rule to support his contention, and several of our sister circuits have addressed so-called "profiling" objections under different Rules. See, e.g., United States v. Sosa, 897 F.3d 615, 619 (5th Cir. 2018) (analyzing a "profiling" objection under Rule 704); United States v. Simpson, 910 F.2d 154, 157 (4th Cir. 1990) (same, under Rule 403); United States v. Gillespie, 852 F.2d 475, 479-80 (9th Cir. 1988) (same, under Rule 404).[11] Under any of those Rules, however, Pires's challenge fails.

_____

[11] In support of his "profiling" argument, Pires also cites to the Second Circuit's decision in United States v. Mejia, 545 F.3d 179 (2d Cir. 2008). But that case made no mention of profiling. To be sure, the court did caution against the dangers of admitting factual testimony under the guise of expert testimony. See id. at 190 ("An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence."). The issue with the expert testimony there, however, was that it concerned factual matters "well within the grasp of the average juror." Id. at 194. As such, the testimony was inadmissible because of Rule 702's requirement that it be based on "scientific, technical, or other

Start with Rule 704(b). It "prohibits an expert witness from testifying that a 'defendant did or did not have the mental state or condition that constitutes an element of the crime charged.'" Peña-Santo, 809 F.3d at 694 (quoting Rule 704(b)). Pires argues that SA Garrabrant's testimony regarding typical sex-trafficking patterns implicitly suggested to the jury that Pires acted as a sex trafficker. But that challenge falls flat for an elementary reason: "Rule 704(b) applies only to opinions about the defendant," and since SA Garrabrant "did not express an opinion about [Pires him]self . . . , his testimony did not violate Rule 704(b)." Diaz v. United States, 602 U.S. 526, 534 (2024) (emphasis added).

Turn then to Rule 404(a). Citing United States v. Gillespie, Pires ostensibly argues that SA Garrabrant's testimony violated Rule 404(a) by impugning Pires's character. See 852 F.2d at 479. But the expert testimony in Gillespie is distinguishable. There, the expert testified about the background "characteristics of a molester," and the government used said testimony as substantive evidence of guilt. Id. at 480 (emphasis added). Here,

---

specialized knowledge" -- not because it impermissibly profiled the defendant. Id.

Here, SA Garrabrant came nowhere close to "substitut[ing] expert testimony for factual evidence of" the underlying crime. Id. at 195. Indeed, he explained at the beginning of his examination that he had no familiarity with the facts of the case or even the names of the concerned individuals.

to the contrary, SA Garrabrant's testimony touched on the patterns employed by -- i.e., the modus operandi (m.o.) of -- child sex traffickers. Cf. United States v. Cross, 928 F.2d 1030, 1050 n.66 (11th Cir. 1991) (distinguishing Gillespie). We routinely permit experts to opine on the m.o. of certain types of criminal activity. See, e.g., Soler-Montalvo, 44 F.4th at 17 (approving expert testimony about "whether [the defendant's] actions were consistent with patterns of known pedophiles or child molesters, similar to testimony on whether a defendant's actions are consistent with the patterns of other drug dealers in a case charging intentional distribution of drug"). And because the government used SA Garrabrant's typical-patterns-and-dynamics testimony in that way -- rather than to show that Pires's "poor character made him likely to" engage in sex trafficking of minors -- it did not run afoul of Rule 404. United States v. Williams, 900 F.3d 486, 491 (7th Cir. 2018) (Barrett, J.); see also id. at 490-91 (rejecting defendant's argument under Rule 404 where government used expert "testimony to show that [defendant's] actions were consistent with common tactics that pedophiles used to lure their victims"); Long, 328 F.3d at 667-68 (approving "expert testimony regarding the modus operandi" of sexual predators over Rule 404(a) objection). So we reject Pires's challenge under Rule 404(a).[12]

---

[12] Although it appears SA Garrabrant made passing reference to certain characteristics of sex traffickers -- e.g., "super

Finally, we analyze Pires's profiling objection under Rule 403. "[T]he standard for exclusion under Rule 403 is a high one." Soler-Montalvo, 44 F.4th at 16. The Rule "permits exclusion not when the evidence is merely outweighed by the dangers of its admission, but only when it is 'substantially outweighed.'" Id. (quoting Fed. R. Evid. 403). To support his Rule 403-based argument, Pires invokes the Fourth Circuit's decision in United States v. Simpson, where the panel held that the district court abused its discretion by admitting testimony about the defendant fitting the "drug courier profile" without the presence of any factual "evidence linking [the defendant] to the drug trade." 910 F.2d at 157. The problem there, though, was not the expert testimony itself; it was how the expert testimony, standing alone, had no probative value in the absence of any supportive factual evidence.[13] As the Fourth Circuit explained:

> The relevant issues in dispute at [the defendant's] trial were his knowing possession of a gun and his intent to board the shuttle to New York. The drug courier testimony had very little probative value to offer on these issues while the government made [the defendant's] status as a drug courier the centerpiece of its case.

charismatic," "a great talker," "very good at reading people," and "really good at understanding vulnerabilities and . . . manipulating" -- Pires does not contend that the government argued or introduced any evidence at trial suggesting that he had such characteristics.

[13] Notably, the Fourth Circuit acknowledged that "[i]f there were any evidence linking [the defendant] to the drug trade, the probative value of th[e] testimony might" be sufficient to outweigh the prejudicial effect under Rule 403. Simpson, 910 F.2d at 157.

- 41 -

Id. at 158. "Under th[o]se circumstances," the Fourth Circuit concluded, "the inherent risk of inflaming the jury, and of misleading it into focusing on the government's unsubstantiated and uncharged allegations of drug crimes, was unacceptably high." Id. Not so here. The government charged Pires with the substantive offense of sex trafficking a minor and conspiracy to commit that offense, and SA Garrabrant's testimony, in conjunction with Daisy's and Burke's testimony, was probative of topics directly at issue in the trial -- i.e., common tactics used by sex traffickers, the types of victims commonly exploited, and a common dynamic between victims and their traffickers.

Our decision in Soler-Montalvo buttresses that conclusion. 44 F.4th at 14-18. There, the defendant appealed his conviction for attempting to persuade, induce, or entice a minor to engage in criminal sexual activity. Id. at 6. Among other arguments on appeal, the defendant contended that the district court erred when it excluded the expert testimony of a psychologist who "would have compared the conversations and surrounding circumstances of th[e] case to the patterns of online predators and identified inconsistencies, thus suggesting that [the defendant's] actions did not accord with those of a typical predator." Id. at 14-15. We agreed with the defendant. After concluding that such expert testimony did not violate Rule 704(b),

we turned to Rule 403's "balancing test." Id. at 16. And, under that rubric, we held that the psychologist-expert's "not-a-typical-predator testimony was highly relevant to and probative of the key issue in the case." Id. at 16-17. That is, the "excluded testimony bore directly on the credibility of [the defendant's] testimony concerning his state of mind and sought to explain (just in the converse of oft-admitted government-expert testimony) how seemingly sinister conduct could be part of innocent sexual fantasy." Id. at 17 (citing Long, 328 F.3d at 666-68); see also id. ("Testimony that [the defendant's] actions were inconsistent with the typical m.o. of one attempting to entice a minor -- as opposed to engaging in role-play with a consenting adult -- [wa]s highly relevant to th[e] charge.").

So too here. SA Garrabrant's testimony about patterns of child sex traffickers and the techniques they use to attract, groom, and then control victims -- in other words, "the typical m.o. of" child sex traffickers -- was highly relevant to the charges in this case. Id.

Of course, Rule 403's balancing act requires an evaluation of the countervailing interests. Where, as here, the objecting party is faced with highly probative evidence, we expect them to point out "great" "countervailing interests weighing against . . . admission" to exclude the testimony under Rule 403. Id. at 18. For substantially the reasons we provide above, Pires

has failed to do so.  Therefore, his profiling challenge under Rule 403's rubric also fails.

### 3. Bolstering Objection

Pires's last challenge to SA Garrabrant's typical-patterns-and-dynamics testimony is that it impermissibly bolstered the prosecution's witnesses.  That argument is unavailing.

"An expert's opinion that another witness is lying or telling the truth is ordinarily inadmissible . . . because the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion."  United States v. Teganya, 997 F.3d 424, 430 (1st Cir. 2021) (quoting United States v. Gonzalez-Maldonado, 115 F.3d 9, 16 (1st Cir. 1997)).  Nevertheless, it is well within a district court's discretion to permit expert testimony that "merely provid[es] context that might prove counter-intuitive to a layperson," without specific reference to another witness's or victim's testimony.  Id.  Of particular relevance here, we have permitted over a "bolstering" objection expert testimony regarding "the behavioral reactions of abuse victims," explaining that "[t]he overwhelming weight of authority" favors admissibility. Alzanki, 54 F.3d at 1006;[14] see also United States v. Johnson, 860

---

[14] Pires tries to distinguish Alzanki by pointing to the expert's credentials in that case.  To the extent Pires seeks to

- 44 -

F.3d 1133, 1140 (8th Cir. 2017) (approving "expert testimony about how individuals generally react to sexual abuse," which may "help[] jurors evaluate the alleged victim's behavior").

That is precisely what SA Garrabrant did here. He described typical traits of victims and explained why they often form strong bonds with their pimps. He explained how such bonds often discourage victims from running away from or exposing the pimps. He likewise informed the jury why sex workers commonly question customers about their racial identities. True, SA Garrabrant's testimony tended to support Daisy's story even though SA Garrabrant neither mentioned her nor claimed to comment on the specific facts of this case. But improper witness bolstering occurs when an expert "testif[ies] that [a] particular victim/witness could be believed." Hoult v. Hoult, 57 F.3d 1, 7 (1st Cir. 1995); see also Teganya, 997 F.3d at 430 (rejecting a bolstering argument where expert "did not purport to be testifying . . . about [defendant] specifically"); Johnson, 860 F.3d at 1140-41 (noting that the expert cannot "impermissibly 'vouch' for the victim by, for example, diagnosing the victim with

challenge SA Garrabrant's credentials, the argument is waived. He did not object to SA Garrabrant's credentials below, nor has he developed any such contention on appeal. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

- 45 -

sexual abuse or expressing an opinion that sexual abuse has in fact occurred"). SA Garrabrant did no such thing.

### D. Gorilla-Pimp Testimony

Next, Pires contends that the district court erred by permitting SA Garrabrant to testify about gorilla pimps. Specifically, Pires takes exception to SA Garrabrant's testimony describing the term "stables" of women, indicating that sex traffickers sometimes "steal" sex workers from each other, and referring to certain pimps as violent toward sex workers. Pires says that such testimony was irrelevant under Rule 401 and thus unhelpful to the jury under Rule 702 and that, even if relevant, the testimony's probative value was substantially outweighed by a danger of undue prejudice under Rule 403.

We review these arguments for plain error because, as we conclude above, Pires failed to preserve them below.[15] Under our plain error review, Pires faces the "heavy burden of showing (1) that an error occurred; (2) that the error was clear or obvious; (3) that the error affected his substantial rights; and (4) that the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United

---

[15] Pires does not conduct any analysis under our plain error standard in his original brief. The government argues that that omission means the claim of error is waived. We need not decide this point because, even on plain error review, Pires's challenge fails.

States v. Latorre-Cacho, 874 F.3d 299, 303 (1st Cir. 2017) (quoting United States v. Prieto, 812 F.3d 6, 17 (1st Cir. 2016)).

Before reaching the analysis, we must frame the question. The question is not whether the district court abused its discretion by admitting irrelevant testimony that unduly prejudiced Pires over a contemporaneous objection. Rather, the issue before us is whether the district court clearly or obviously erred by failing to sua sponte strike, or give a curative instruction after SA Garrabrant offered, the gorilla-pimp testimony.

Viewed through that lens, we cannot say that the district court erred, let alone plainly or obviously so. "The general rule seems to be that a cautionary instruction should be given, if requested, but the failure of the trial court to give one sua sponte is not reversible error." United States v. Rivera-Santiago, 872 F.2d 1073, 1083-84 (1st Cir. 1989) (collecting cases). The same rule applies where counselled defendants make the "seemingly plausible strategic choice[]" not to object to the admission of objectionable evidence. United States v. LeMoure, 474 F.3d 37, 44 (1st Cir. 2007) ("[I]f counsel has not objected to evidence . . . , it does not necessarily follow that the judge has erred by tolerating the evidence . . . ."). "[O]ne could describe such choices as waivers of claims of error, [while] others might say

that there is no error at all when counsel is content and foregoes an optional objection."  Id. (citation omitted).

While perhaps harsh, this rule is undergirded by weighty principles.  For one thing, lawyers sometimes make strategic choices not to object, "think[ing] that 'objectionable' testimony from an adverse witness helps more than it hurts or that a cautionary instruction will underscore testimony best ignored." Id.  And trial judges, saddled with the heavy burden of "superintending a fast-paced criminal trial," cannot play mind reader: from their perch, it is not "easy to know . . . how sua sponte interference . . . can disrupt counsel's own strategy, even when the purpose of the judge is to help rather than to hinder." United States v. Cudlitz, 72 F.3d 992, 1002 (1st Cir. 1996).  Given these practical considerations, we are "extremely reluctant" to "mandat[e] that the district courts act sua sponte to override seemingly plausible strategic choices on the part of counselled defendants."  De La Cruz, 902 F.2d at 124.

With that background in mind, we cannot say that, in the context of this case, the district court clearly or obviously erred by failing to sua sponte strike, or give a curative instruction after, SA Garrabrant's gorilla-pimp testimony.

Recall the context.  Prior to SA Garrabrant's taking the stand, Pires objected, citing "grave[] concern[]" that SA Garrabrant's testimony would too closely resemble "the evidence in

[t]his case, thus encouraging the factfinder to infer guilt merely because his case may have consistencies with other cases of this nature." (Emphasis added.) He reiterated this same objection twice.

Recall, too, what occurred when SA Garrabrant ultimately took the stand at trial. He testified about some conduct that closely resembled Pires's and other conduct that did not -- specifically, he contrasted "gorilla" pimps, who are violent toward and strip search sex workers, with finesse pimps and defined the term "stable[s]" of women. In a similar manner, he described typical dynamics between pimps and sex workers, some of which tracked Pires's relationship with Daisy and some of which did not.

Rather than timely and specifically objecting during the direct examination, Pires opted to wait until cross-examination to draw out distinctions between SA Garrabrant's testimony and the facts of the case. For instance, he asked SA Garrabrant about: (1) pimps doing "[b]ody cavity searches" and "[v]ery invasive type[s] of stuff" to keep money from sex workers; (2) methods pimps commonly use to exert control over victims, including controlling sleeping schedules, isolating victims from family and friends, prohibiting victims from associating with other men, and taking possessions away; and (3) pimps wanting sex workers who are "compliant," "rule follower[s]," and "not too headstrong." And,

in closing, Pires sought to capitalize on these distinctions. Pires specifically sought to paint himself as a man who: (1) had one girlfriend (not stables of women); (2) never strip searched Daisy for money (indeed, he let her have money); (3) did not shower Daisy with gifts; and (4) did not isolate Daisy. Pires explained to the jury that SA Garrabrant's testimony was about "professional" or "predatory pimps" who take young girls from youth shelters or suburbs "into the city and win[e] and din[e] them"; "us[e] violence and threats against women and their families"; or "travel women around or put them up in hotels, cavity searching and strip searching their women after dates." Those patterns, Pires argued, are "[h]orrible situations that have nothing to do with this case."

In light of Pires's conduct before and during trial -- i.e., his pre-testimony objections, lack of contemporaneous objections, cross-examination, and closing arguments -- the district court reasonably could have understood Pires to be making a strategic choice to use SA Garrabrant's allegedly objectionable testimony to show how Pires's "actions were not consistent with illegal activity." Soler-Montalvo, 44 F.4th at 15; see also De La Cruz, 902 F.2d at 124 (holding no reversible error where, "for tactical reasons, defendant may have" chosen not to object). Thus, we discern no error, let alone clear or obvious error, on the district court's part.

A note of caution.  There certainly was a risk that SA Garrabrant's gorilla-pimp testimony could amount to "unfair prejudice," especially because of "the sordid and disturbing nature of [the] subject matter."  Anderson, 851 F.2d at 393. Indeed, we think that, if Pires had contemporaneously objected at trial, it would have been proper for the district court to strike the testimony or give a curative instruction.  But Pires did not do so.  See Cudlitz, 72 F.3d at 1002 ("[W]e think that while a cautionary instruction would plainly be proper at the time that the question is asked and denied, its omission is not normally error where no such contemporaneous instruction was requested."). And although we will not lightly infer that a criminal defendant's non-objection amounts to a plausible strategic decision, the context here reasonably indicates that Pires's non-objection was a considered part of his trial strategy.  District courts are not required to sua sponte intervene in such circumstances.

## V. STATEMENTS DURING SUMMATION

Pires's final challenge takes aim at some of the prosecutor's statements during closing and rebuttal.  We recite the relevant events prior to and during summation.

As part of the government's case in chief, it called Daisy, who underwent direct and cross-examination.  Once she finished testifying, she was dismissed from the witness stand. But shortly afterward, the district court received documents from

DCF in response to a subpoena issued by Pires. The documents included statements that Daisy made to a social worker on August 8, 2019, which arguably undermined Daisy's credibility.

Pires expressed a desire to question Daisy about the allegedly inconsistent statements. The government objected, arguing that further questioning would be improper. In advocating its position, the prosecutor stated (outside the presence of the jury) that "if we're going to have [Daisy testify] again, in a room full of strangers with the defendant, the only person who should be seen putting her through that is the defense."

The district court permitted Daisy to testify as part of the defense's case, allowing the defense to call Daisy back to the stand during the government's case in chief. The district court explained to the jury that Daisy was called out of order "just for scheduling reasons." When Daisy took the stand, both Pires and the government asked questions.

Summation occurred later that day. During the government's closing argument, the prosecutor said:

> I expect that you may be implored by the defense not to believe Daisy. And when they ask you not to believe her, ask yourselves what in the world would be her motivation to come in here and lie, to walk through those doors and take that witness stand twice and face a room full of strangers, to face the defendant, to discuss her body and what was done to it by multiple adult men with the help of the defendant, to be forced to view an advertisement selling her body, text message[s] detailing how much she was worth, pornographic images

- 52 -

and videos that she knew about and, yes, some that she did not.

She did not tell the uniform male officers, who she met for the first time on August 1, 2019, that she had been trafficked. When the police -- the people she was evading came in and separated her from the person she thought she loved, she did not immediately tell on her boyfriend. On August 1st, 2019, <u>or as Daisy was brought back in here today to tell you</u>, on August 8, 2019, when she spoke with DCF. (Emphasis added.)

Pires objected at the conclusion of the government's closing argument. He contended that the prosecutor's statement impermissibly implied that he had "d[one] something improper by making" Daisy come back into court to testify, and that the statements also amounted to vouching. The district court noted the objection but took no other action.

Pires's counsel then had an opportunity to close. Sure enough, defense counsel sought to impugn Daisy's credibility, calling her, among other things, "a troubled teenager, who had a very strong will, and a fiercely independent and rebellious streak." Defense counsel continued by attempting to paint Daisy as the mastermind behind the commercial sex and describing her story as inconsistent. In fact, on multiple occasions, defense counsel said that Daisy lied. For instance, defense counsel insisted that Daisy's story about having commercial sex with Pires's uncle "simply did not happen," and directly stated that "[s]he lied to you" (<u>i.e.</u>, the jury) and "got caught lying to you" (again, the jury) about who was communicating with the customers.

- 53 -

Defense counsel likewise suggested to the jury that Daisy had racial biases. In particular, to undermine Daisy's testimony that Pires was the one who texted customers about their racial identities, defense counsel stated that it was Daisy who sent the texts and said: "race is something that appears to matter a great deal to Daisy in that text," and, on another occasion, "[r]ace matters to Daisy." Defense counsel took aim, too, at Burke's credibility, calling her an "addict" and accusing her of lying multiple times.

Next up, the prosecutor's rebuttal. The prosecutor started with:

> I'm not going to get up here and call people liars or addicts or racist because I'm not allowed to do that and because it's not my job to do that. You all were picked for a reason. You were picked because you bring with you common sense, and it is your responsibility, your sole responsibility to judge the credibility of witnesses who come into this room, who raise their right hand, and who take an oath to tell the truth. It is your job to judge that credibility, not mine, and certainly not [defense counsel's].

Although Pires did not object at trial, he now takes issue with the prosecutor's remarks in rebuttal.

## A. Preservation

Pires contends (1) that the prosecutor's statement, "as Daisy was brought back in here today to tell you," implied to the jury that Pires did something improper by recalling Daisy to testify; and (2) that the prosecutor's initial remarks on rebuttal

improperly impugned the role of defense counsel. Pires preserved the former challenge but concedes that he did not preserve the latter. We review preserved challenges to improper arguments during summation de novo and unpreserved challenges for plain error. See Pérez-Greaux, 83 F.4th at 30.

## B. Closing Statements

We begin with the prosecutor's statement in closing: "as Daisy was brought back in here today to tell you."[16] Viewing that statement in context, as we must, we discern no misconduct and thus no error. See United States v. Bennett, 75 F.3d 40, 46 (1st Cir. 1996) (viewing prosecutor's remarks "[i]n context"). The statement was one of "incontrovertible truth" -- Daisy was brought to court twice to testify before the jury. United States v. Taylor, 848 F.3d 476, 490 (1st Cir. 2017). What is more, Pires's contention that the statement implied to the jury that he did something wrong by recalling Daisy to testify carries no water because that "was not the comment's 'manifestly intended' or 'natural[] and necessar[y]' meaning when read in the context of the defense's closing argument." United States v. Vázquez-Larrauri, 778 F.3d 276, 286 (1st Cir. 2015) (alterations

---

[16] Pires also contends in his brief that "[t]he government used this improper argument to bolster the credibility of its witness." This lone sentence is unaccompanied by any developed argument, and so the argument is waived. See Zannino, 895 F.2d at 17.

in original) (quoting United States v. Newton, 327 F.3d 17, 27 (1st Cir. 2003)).  And we do "not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."  Id. (quoting United States v. Taylor, 54 F.3d 967, 979 (1st Cir. 1995)); cf. Dagley v. Russo, 540 F.3d 8, 17 (1st Cir. 2008) (explaining that the Supreme Court has "warned courts against giving too much weight to stray remarks in the course of a closing argument or assuming that the jury would interpret each and every statement in the most damaging manner possible" (citing Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974))).

## C. Rebuttal Remarks

We are also unconvinced that the district court's failure to sua sponte strike the prosecutor's statements in rebuttal amounted to plain error.

"An error is only clear or obvious when it is indisputable in light of controlling law."  United States v. Facteau, 89 F.4th 1, 27 (1st Cir. 2023) (quotation marks and citation omitted).  Discerning whether there was error here requires us to determine whether the prosecutor's statements in rebuttal crossed the blurry "line separating acceptable from improper advocacy."  United States v. Young, 470 U.S. 1, 7 (1985). Not only that: even if there is "no doubt the prosecutor" crossed

the line, "[r]eversal is appropriate only if the improper remarks were so egregious as to amount to plain error." United States v. Nickens, 955 F.2d 112, 121 (1st Cir. 1992). "We evaluate the prosecutor's comments . . . 'not in sterile isolation, but within the framework and context of the actual trial,'" id. (quoting United States v. Rodriguez-Estrada, 877 F.2d 153, 159 (1st Cir. 1989)), which includes reviewing "the prosecutor's improper remarks . . . in light of defense counsel's analogous impropriety in provoking them," id. at 122.

In this case, even assuming that the prosecutor's statements amounted to improper advocacy, we hold that the comments were not so egregious as to constitute plain error. We have long acknowledged that "summations in litigation often have a rough and tumble quality." Bennett, 75 F.3d at 46. So we afford prosecutors "some leeway to respond to inflammatory attacks mounted by defense counsel." Nickens, 955 F.2d at 122 (quoting Rodriguez-Estrada, 877 F.2d at 158). On plain error review, we are reluctant to reverse "when a prosecutor's remarks are made to rebut specific statements by defense counsel[] and are proportionate to that end." Taylor, 54 F.3d at 978.

Here, the prosecutor's statements in rebuttal, while provocative, were short and directly refuted remarks by defense counsel. The statements squarely addressed defense counsel's similarly provocative remarks in closing -- i.e., that both Daisy

and Burke lied to the jury on multiple occasions, that race mattered a lot to Daisy, and that Burke was a drug addict lying to absolve herself of liability. See Nickens, 955 F.2d at 121 ("[B]oth parties have an obligation 'to confine arguments to the jury within proper bounds,' and defense counsel, no less than the prosecutor, 'must refrain from interjecting personal beliefs into the presentation of his case.'" (quoting Young, 470 U.S. at 8-9)). In short, "defense counsel's remarks set the tone for the prosecutor's rebuttal," and the prosecutor made the complained-of statements "only after defense counsel, in h[er] closing argument, repeatedly expressed h[er] personal beliefs[ and] accused prosecution witnesses of lying." Id. at 122.

To be clear, we do not suggest that "a trespass by the defense gives the prosecution a hunting license exempt from ethical restraints on advocacy." United States v. Capone, 683 F.2d 582, 586 (1st Cir. 1982) (citation omitted). Had the prosecutor found defense counsel's statements objectionable, the more prudent course of action was to object and "ask the District Judge to deal with defense counsel's misconduct." Young, 470 U.S. at 14. But, for the reasons outlined above, we cannot say that the district court clearly erred here by failing to sua sponte strike the argument.

## VI. CONCLUSION

For the foregoing reasons, the judgment of the district court is **<u>affirmed</u>**.[17]

---

[17] Having upheld Pires's convictions on both counts, we need not reach his argument that vacating one count would warrant resentencing on the other.