# United States Court of Appeals
## For the First Circuit

No. 24-1421

UNITED STATES,

Appellee,

v.

RICARDO MIDDLETON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Gelpí, Thompson, and Dunlap,
Circuit Judges.

Charles W. Rankin, with whom Rankin & Sultan was on brief, for appellant.

Brian S. Kleinbord, Assistant United States Attorney, with whom Andrew B. Benson, United States Attorney, was on brief, for appellee.

May 8, 2026

**THOMPSON, Circuit Judge**. A nightmarish four-day stretch of abuse and forced prostitution led to the arrest and indictment of defendant-appellant Ricardo Middleton for sex trafficking in violation of 18 U.S.C. § 1591(a)(1) and (b)(1). A series of inculpatory phone calls Middleton made from prison tacked on a second charge for obstruction of a sex trafficking prosecution in violation of 18 U.S.C. § 1591(d). After an unforgettable four-day trial (the reader will soon learn what made certain aspects so memorable) in the United States District Court for the District of Maine, a jury found Middleton guilty of both offenses, and the court followed up by sentencing him to thirty years in prison followed by ten years of supervised release.

This appeal followed. Middleton challenges the use of expert testimony at his trial, the sufficiency of the evidence used to prove his obstruction conviction, the reasonableness of his thirty-year sentence, and the effectiveness of his trial counsel. For reasons we'll explain, we affirm Middleton's convictions and sentence, and we dismiss his ineffective assistance of counsel claim as premature.

**I**

**A**

The following facts related to Middleton's sufficiency challenge are brought to the reader in the light most favorable to the prosecution; facts relevant to Middleton's other appellate

- 2 -

claims are presented in equipoise, with further exposition coming soon when we address those claims themselves. See United States v. Díaz-Rosado, 857 F.3d 116, 117 (1st Cir. 2017).

It all began one fall morning in November 2015. Adrienne Rush and her friend Julie Deschaine needed a fix to alleviate their withdrawal sickness from a shared heroin addiction. Deschaine contacted her dealer, Matt Thatcher, who agreed to deliver drugs to Deschaine's room at the Knights Inn in South Portland, Maine. Thatcher showed up with two companions -- Middleton and his future co-defendant, Sherry Jones.

Thatcher apparently proposed that Rush and Deschaine find customers for his drugs in exchange for the heroin the friends craved. The two accepted Thatcher's offer, but their efforts proved less than fruitful. After failing to find buyers, the group relocated to Rush's friend's apartment nearby. During the drive over, Middleton asked Rush if she wanted to make money providing "company," but Rush didn't fully grasp the meaning of his words. Rush and Deschaine smoked crack together at the apartment before Middleton told the group it was time to return to the Knights Inn.

Back at the Knights Inn, only Rush and Middleton made their way to Deschaine's room. Once inside, Middleton placed a phone and a condom on a table and told Rush a man would arrive soon. Middleton instructed Rush to let the man in and to do whatever he told her. At this point, Rush realized Middleton

wanted her to engage in commercial sex and said that she didn't want to. Middleton told her she needed to be strong because they both needed the money.

Middleton left and a man arrived at the room soon after. The man silently placed money on the table, and Rush began crying while he "flipped [her] over . . . smushed [her] face into the pillow and just had sex." Once it was over, Rush used the phone Middleton left in the room to text Deschaine that she wanted to "go home like now" and shower. Middleton reentered the room to collect the money and the phone while Rush remained in tears.

The group (all five of them) drove back to Rush's friend's apartment, where Rush could shower. Rush made her way to the shower as planned, but Middleton had other ideas. Middleton entered the bathroom, kicked Rush to her knees, pressed her head into the toilet, and raped her. When he was done, Middleton kicked Rush over and told her that he was going to make a lot of money off her.

Soon after, the group left the apartment again and drove to Bath, Maine. They arrived at a man's house in Bath where Middleton told Rush to get out of the car and head inside. Rush, now aware of the trip's purpose, told Middleton she did not want to have sex with another customer. Middleton said he didn't care, and Rush entered the home feeling that she had no other choice.

After having sex with the man inside, Rush returned to the car and Middleton again took the money Rush collected from the man.

Then the group drove back to the Knights Inn where Middleton said a third customer would be. Rush told Middleton she wasn't going to see another customer, but she ultimately went into Deschaine's room as ordered. But the third customer never entered the room. So Middleton went to the room and pulled Rush out by her hair, slapped her, and told her to get back in the car. Rush got back in the car without Deschaine, and the group took off for a different apartment in Saco, Maine, where Rush spent a sleepless night.

The next morning, the group (now down to four: Middleton, Thatcher, Jones, and Rush) shipped down to Boston to score some drugs. Middleton told Rush during the trip that whatever life she had before was gone, and that he was the only person she had left. The group made a few house calls in Massachusetts, but Rush was kept from talking to anyone or using any phones. At one point, Middleton discovered Rush using a phone and punched her in the face with a force Rush later described like "he knocked out all [her] teeth." At another point, Middleton told Rush he wanted her to get his name tattooed on her "like a brand." Rush objected to that idea, leading to another punch in the mouth from Middleton.

The group left Massachusetts with their drugs and returned to the Saco apartment. While Thatcher weighed the

product, Middleton, Jones, and Rush left for "some girl's house" (to use Rush's words). (The "girl" was Kafia Figaro, a life-long acquaintance of Middleton and future witness for the prosecution.) When the group (now just three: Middleton, Jones, and Rush) arrived, Figaro and her ex-husband were in a domestic dispute that ended with police intervention. Figaro left with the group and headed back to the Saco apartment.

Back at the increasingly crowded Saco apartment, Rush got her hands on a phone and messaged friends on Facebook for help. She messaged Deschaine, "I cannot get the fuck out of here. I want to leave and I can't." She told another friend, "I'm being held against my will, I'm fucking scared . . . . This guy will not bring me home and wants to own me." Rush tried to flee to a friend's house in the area, but Middleton, Thatcher, and Sherry pursued and physically restrained her.

Rush succeeded on her second escape attempt. This time, she concocted a story for Middleton about a relative who would call the cops if she didn't hear from Rush by a certain time. The ruse gave Rush enough time to get away and phone another friend, Santana Garcia, for help. Garcia met Rush shortly thereafter and drove her to safety. When Garcia found Rush, Rush smelt "like body odor and . . . pee, like sewage." Rush's hair was a mess, she had a black eye, and scratches all over her body.

Middleton and Jones failed to locate Rush again, but not for lack of trying. A few days after Rush escaped, they dropped in on Deschaine, seizing her phone and physically assaulting her in one final, but unsuccessful effort to find Rush.

**B**

Middleton was arrested on April 28, 2022, following a one-count indictment charging Middleton, Jones, and Thatcher with sex trafficking by force, fraud, and coercion in violation of 18 U.S.C. § 1591(a)(1) and (b)(1). Middleton pleaded not guilty and remained in custody while awaiting trial. Over a year later, a superseding indictment charged Middleton for obstruction of a sex trafficking prosecution in violation of 18 U.S.C. § 1591(d). He picked up that extra charge due to several phone calls he made from lock-up to his longtime friend Christianna Dedrick. Here's how those conversations went down.

Middleton called Dedrick and told her about his plan to deny being with Jones and Rush at Figaro's house when the cops responded to the domestic dispute. (As we mentioned earlier, Rush, Middleton, and Jones went to Figaro's house while Thatcher weighed the Boston drugs.) Throughout the recorded calls, Middleton repeatedly asked Dedrick to pass on a message to Jones. Middleton wanted Jones to say that they never went to Figaro's house with Rush. Specifically, Middleton said Jones needed "to tell the truth and say that they wasn't there," or "No. I don't recall this

- 7 -

incident," or "I don't recall that night. I wasn't a part of that night. I don't know nothing." (Middleton also made it clear to Dedrick that he thought Figaro was the only credible witness connecting him to Rush and his sex trafficking charges.)

In another similar call between Middleton and Dedrick, Dedrick questioned the veracity of Middleton's repeated requests and told him that she had spoken to Figaro. Middleton responded, "You didn't talk to [Figaro] because you don't know [Figaro], and I don't know [Figaro], so I don't know how she mentioned anything." (Dedrick later testified that she knew and grew up with Figaro, and that Middleton also knew her.) Middleton then repeated his request for Dedrick to tell Jones "that anybody saying that they was with me, they need to tell the truth and say that they wasn't with me . . . that's what everybody else need to say, to tell the truth."

And in another call, Middleton admitted to Dedrick that "this Sherry Jones person" could provide credible testimony at his trial, but his other co-defendant (Thatcher) was a drug addict and therefore not credible. But, regardless, Middleton wanted his co-defendants to "keep [his] name out of their mouth" and for Dedrick to tell Jones "let me do me." To Middleton, the question was whether "the defendants [were] going to plead out and start pointing fingers at each other, or [were] the defendants going to go home?" And the only way Middleton thought he would "do some

time [was] if [his] codefendants start[ed] pointing the finger at [him]." His final message for Dedrick to relay to Jones was that "we coming home unless motherfuckers start pointing the finger at each other."

## C

Middleton proceeded to trial where the government called a roster of now familiar witnesses including Rush, Deschaine, Garcia, and Dedrick, along with expert witness Dr. James Hopper, who we will formally introduce to the reader shortly. Middleton also took the stand in his defense. On the fourth day of trial, the jury returned guilty verdicts against Middleton for sex trafficking by force, fraud, or coercion and for obstruction of a sex trafficking prosecution.

The court later sentenced Middleton to 360 months' imprisonment -- 300 months for sex trafficking and a consecutive term of 60 months for obstruction. The court reached this 360-month total based on Middleton's sentencing guideline range of 360 months to life, and an assessment of the factors outlined in 18 U.S.C. § 3553(a).[1] Middleton timely appealed.

---

[1] The court applied two sentencing enhancements when calculating Middleton's guideline range: one for a vulnerable victim and one for a leadership role in the offense. Likewise, the grouping of Middleton's obstruction conviction and his sex trafficking conviction effectively led to another enhancement. Middleton does not challenge these sentencing enhancements on appeal, so we won't be discussing them in detail.

- 9 -

Middleton raises four arguments on appeal. First, he claims the district court abused its discretion in admitting the expert testimony of Dr. Hopper because his opinions on the impact of sexual assault on memory were (in Middleton's view) within the bounds of common knowledge and impermissibly invaded the jury's task to evaluate Rush's credibility. Second, Middleton argues the government failed to present sufficient evidence to convict him of attempted obstruction of a sex trafficking prosecution. Third, Middleton challenges his thirty-year sentence as procedurally and substantively unreasonable, primarily due to the disparity between his sentence and those of his co-defendants. And lastly, Middleton raises an ineffective assistance of counsel claim because his attorney did not cross-examine Dedrick. We'll work through these appellate asseverations in the order we've just laid out, which means the challenge to Dr. Hopper's testimony is up first.

**A**

Middleton contested Dr. Hopper's testimony from the jump. The government filed a notice to introduce Dr. Hopper's testimony before trial, and Middleton responded with a motion in limine to exclude said testimony. Middleton never challenged Dr. Hopper's qualifications or "the science of his opinion," but argued that the expert testimony would not assist the jury and would encroach on the jury's province of assessing witness credibility.

Additionally, Middleton acknowledged that even though Dr. Hopper was a blind expert (meaning he never interviewed Rush and would not be opining on her experience specifically), only one witness in this case suffered sexual trauma and the jury would quickly infer the expert testimony was "laser sighted" on Rush.

The government's rebuttal framed Dr. Hopper's testimony as "important to a trier of fact responsible for judging the credibility of witnesses," because it would explain how the brain responds to trauma and how trauma impacts memory, with some hypotheticals to illustrate the point. The government assured the court that Dr. Hopper would not be making any credibility determinations, but he would help the jury "decide whether the percipient victim in this case is lying or whether there potentially could be an alternate explanation for her inconsistencies."[2]

After hearing from both sides, the court had reservations over whether Dr. Hopper's testimony would be relevant or helpful to the jury. The court ultimately decided that the brain's response to trauma, including sexual assault, and trauma's impact on memory fell beyond the ken of lay persons.[3] Thus, Dr.

---

[2] This differs slightly from the government's position at oral argument, where it stated the testimony was "just to help the jury understand how memory works in cases like this."

[3] The "ken" of laypersons and jurors comes up frequently in challenges to expert testimony, see, e.g., United States v. Pires, 138 F.4th 649, 667 (1st Cir. 2025), and we'll be using this term

Hopper's testimony on those facts would assist the jury and was admissible, but the court warned the government that it needed to "focus its questioning." The court did not feel so positively about other aspects of Dr. Hopper's proposed testimony. It excluded any testimony from Dr. Hopper on "reflex responses and habit responses" because the government failed to establish how such testimony would be relevant or assist the jury. The court also excluded testimony on the different ways a victim's brain can respond to trauma because that, too, appeared to be irrelevant and unhelpful. And, lastly, the court barred the government from asking Dr. Hopper any hypothetical questions because, in its view, the "[u]se of hypotheticals divorced from established facts tethered to this case and this victim . . . could invite speculation and it risk[ed] unduly influencing the jury's exclusive duty to determine the credibility of the witnesses." So, the court ended up splitting the expert-baby, and Dr. Hopper took the stand.

We'll provide a flavor of Dr. Hopper's testimony and highlight the parts most relevant to Middleton's arguments (although Middleton does not quote or cite any specific testimony as particularly problematic). Dr. Hopper explained the concepts

---

of Scottish origins, too. In legalese, "ken" refers the scope of one's knowledge, a critical factor in determining the admissibility of expert testimony. See id.

of "central" and "peripheral" details in human memory -- the former being significant events our minds often store long-term and the latter being less significant events we give less attention to. Dr. Hopper also informed the jury that trauma activates our "defense circuitry" and triggers a chemical response affecting regions of the brain known as the prefrontal cortex and the hippocampus. That chemical response can "amplify or burn in" central details into a trauma victim's memory at the expense of peripheral details or later central details if the trauma goes on for a prolonged period.

Middleton argues on appeal that the district court violated Federal Rule of Evidence 702 by admitting Dr. Hopper's testimony.[4] That Rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely that not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

---

[4] Middleton also objected at trial to Dr. Hopper's testimony under Federal Rule of Evidence 403. Middleton has not raised this issue on appeal and has thus waived his ability to do so. See United States v. Teganya, 997 F.3d 424, 432 n.6 (1st Cir. 2021).

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc. described this rule as establishing a "gatekeeping role for the judge" to determine that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). We've similarly stated that "we do not permit expert testimony when its subject is well within the bounds of a jury's ordinary experience and so it has little probative value but might unduly influence the jury's own assessment of the inference that is being urged." United States v. Pires, 138 F.4th 649, 667 (1st Cir. 2025) (citation modified).

As the parties agree, we review the district court's ruling on the admissibility of expert testimony for abuse of discretion. See, e.g., United States v. Alzanki, 54 F.3d 994, 1005 (1st Cir. 1995); see also Pires, 138 F.4th at 666 (applying the standard of review owed to a preserved objection where the government did not argue otherwise). Under this standard, we review findings of fact for clear error, questions of law de novo, and judgment calls under "classic abuse-of-discretion review." United States v. Jackson, 58 F.4th 541, 550 (1st Cir. 2023)

(quoting Martínez v. United States, 33 F.4th 20, 27 (1st Cir. 2022)). We will reverse a trial court's judgment call if we conclude "a material factor deserving significant weight" has been ignored, an improper factor was relied on, or when all the right factors have been considered, but the court made "a serious mistake in weighing them." Id. (quoting Martínez, 33 F.4th at 27).

Middleton's briefing never quotes Dr. Hopper's testimony directly, but he alleges the testimony generally made "an excuse for Rush's faulty memory by claiming that victims of sexual trauma experience changes in the neurobiology of their brain, and thus may be sketchy on peripheral details." Thus, Middleton argues his sex trafficking conviction must be reversed, and a new trial conducted, because Dr. Hopper's testimony (1) did not provide facts "beyond the experience of ordinary people," and (2) improperly invaded the jury's "exclusive role in evaluating witness credibility." After scrutinizing the testimony, the district court's decision, and our caselaw, we disagree with both contentions.

The district court's determination of whether an expert's testimony is within the realm of lay-knowledge is "guided by a 'common sense inquiry.'" Pires, 138 F.4th at 667 (quoting United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994)). The idea being that, if an expert testifies to something the average person already knows, it will not assist the jury as required by

Rule 702(a). See Alzanki, 54 F.3d at 1006. Here, the district court found certain aspects of Dr. Hopper's proposed testimony beyond the ken of laypersons (along with judges and lawyers), thus satisfying that requirement of Rule 702.

Our court has found expert testimony on drug dealing methods, narcotics trafficking by vessels, crime family organizations, "grooming behavior by an individual seeking out sex with minors", and "the behavioral reactions of abuse victims" to all fall beyond the ken of the average layperson. Pires, 138 F.4th at 667 (collecting cases) (first quoting United States v. Soler-Montalvo, 44 F.4th 1, 17 (1st Cir. 2022); and then quoting Alzanki, 54 F.3d at 1006). Dr. Hopper's testimony explained the brain's neurochemical responses to trauma, and how those neurochemicals impact parts of the brain essential to encoding memories. Nothing about that sounds in lay-knowledge, much like the areas of expert testimony addressed in our precedent. See id.; see also Alzanki, 54 F.3d at 1006 (finding expert testimony on the behavioral responses of abuse victims to be "somewhat technical, and beyond the realm of acquired knowledge normally possessed by lay jurors"). Thus, contrary to Middleton's position, the district court did not abuse its discretion in finding Dr. Hopper's testimony beyond the ken of laypersons.

As for Middleton's second Rule 702-related challenge (that Dr. Hopper's testimony invaded the jury's exclusive role in

- 16 -

assessing witness credibility), we cannot agree that the district court abused its discretion. We say that the issue of credibility "belongs to the jury" because jurors "are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." Aetna Life Ins. Co. v. Ward, 140 U.S. 76, 88 (1891). So, in most circumstances, an expert witness will not be allowed to opine on the veracity of a witness's testimony because the jury is presumed capable of making that decision for itself. But expert testimony is not inadmissible "simply because it concerns a credibility question." United States v. Shay, 57 F.3d 126, 134 (1st Cir. 1995); see also Pires, 138 F.4th at 667-68 (finding expert testimony relevant because it "may have helped the jury assess [the witness's] credibility"). For instance, in Shay, we held that an expert psychiatrist tendered by the defense should have been permitted to testify that the defendant "suffered from a recognized mental disorder that caused him to make false statements even though they were inconsistent with his apparent self-interest" because that "specialized opinion testimony" would have "exploded common myths about evidence vital to the government's case." Shay, 57 F.3d at 133-34 (citation modified).

Dr. Hopper's testimony falls into the admissible, yet narrow, category of expert testimony that touches upon credibility for a few reasons. As Middleton concedes, Dr. Hopper never offered

an opinion about Rush's credibility. And the court carefully confined his testimony to scientific information about the brain's response to trauma and trauma's effect on memory that -- as we've already explained -- was beyond the average juror's knowledge.[5] Furthermore, the court gave clear instructions regarding the expert testimony and credibility. Specifically, the court told the jury that they (1) did not "have to accept the testimony of any witness if you [found] the witness not credible"; (2) "may accept or reject such [expert] testimony"; and (3) "that you alone decide how much of a witness's testimony to believe and how much weight it should be given." (Emphasis added.)[6] Therefore, the court dispelled any doubt "that the jury remained perfectly free to reject [the] expert opinion." Alzanki, 54 F.3d at 1006.

Accordingly, we believe Dr. Hopper's testimony "may have helped the jury assess [Rush's] credibility, which [Middleton] sought to undermine through the trial by pointing out the

---

[5] There appear to be moments where Dr. Hopper got out over his skis with some topics and examples, one of which was the memory of a deliberating jury. However, the court and prosecutorial counsel reined him in with aid from Middleton's objections. In other words, the adversarial process worked out the kinks. Cf. Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

[6] The court exercised further caution to this point when instructing the jury to "consider the testimony of Adrienne Rush with particular caution" (Rush being the victim/witness that Middleton claims Dr. Hopper's testimony impermissibly bolstered).

inconsistencies in her testimony," without providing an opinion on Rush's credibility that we'd expect the jury to decide for itself. See Pires, 138 F.4th at 667 (citation modified). All to say, Dr. Hopper's testimony did not usurp the jury's role of determining credibility and, on this record, the court did not abuse its discretion in admitting his testimony.

**B**

We turn our focus next to Middleton's challenge to the sufficiency of the evidence supporting his conviction for attempted obstruction of a sex trafficking prosecution. We review claims of this ilk de novo (as both parties agree). See, e.g., Pires, 138 F.4th at 657. But this niche brand of de novo review requires us to view the evidence in the light most favorable to the government "and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged count or crime." Id. at 657-58 (quoting United States v. Santonastaso, 100 F.4th 62, 68 (1st Cir. 2024)). So we won't be second-guessing any of the jury's credibility determinations or re-weighing the evidence here, but we will make sure the verdict wasn't irrational. Id. at 658.

When the government accuses a defendant of attempting to commit a crime, it must "establish both a specific intent to commit the substantive offense and a substantial step toward its

commission." United States v. Pérez-Rodríguez, 13 F.4th 1, 13 (1st Cir. 2021). And the parties agree Middleton was convicted of attempted obstruction, as the government argued in closing, although the indictment did not specifically charge Middleton for attempted obstruction and the jury did not issue a specific verdict for this count.

To convict Middleton of obstruction, the government needed to prove beyond a reasonable doubt that Middleton knowingly "obstruct[ed], attempt[ed] to obstruct, or in any way interfere[d] with or prevent[ed]" a sex trafficking prosecution or investigation. 18 U.S.C. § 1591(d); see also United States v. Farah, 766 F.3d 599, 613 (6th Cir. 2014) (explaining that the appropriate mens rea for § 1591(d) is "knowingly" because the statute is silent (citing Staples v. United States, 511 U.S. 600, 619 (1994))). The parties agree that Middleton's conviction for this count rests on the recorded jail calls we described earlier and Dedrick's testimony that provided a little context to those calls.

In protest of his attempt conviction, Middleton argues the jail calls "cannot be a substantial step towards obstructing justice." We've described a "substantial step" as "less than what is necessary to complete the substantive crime, but more than mere preparation." Pérez-Rodríguez, 13 F.4th at 13 (citation modified). With this inquiry, we aim to "distinguish between those

- 20 -

who express criminal aims without doing much to act on them and others who have proved themselves dangerous by taking a substantial step down a path of conduct reasonably calculated to end in the substantive offense."  Id. (quoting United States v. Doyon, 194 F.3d 207, 211 (1st Cir. 1999)).

Here, we have little trouble concluding that a rational jury could have convicted Middleton of attempting to obstruct a sex trafficking prosecution based on the jail calls and Dedrick's testimony.  Middleton called Dedrick several times and repeatedly requested that she relay a message to Jones.  In one call, Middleton told Dedrick, "So if anybody knows they wasn't there, they need to tell the truth and say that they wasn't there.  You hear what I'm saying?"  To which Dedrick responded, "I hear you. I heard you the first 30 times you said it."  The fact that Middleton kept up his requests for Dedrick to tell Jones to either falsify or not cooperate with the government shows both a substantial step toward commission of the substantive offense and corroborates Middleton's intent to engage in criminal conduct. See United States v. Dworken, 855 F.2d 12, 17 (1st Cir. 1988). That is, the calls demonstrate that Middleton took action "reasonably calculated to end in the substantive offense."  Doyon, 194 F.3d at 211.

As for Middleton's alternative claim that it wasn't clear who Middleton wanted Dedrick to relay his message to, Dederick made that fact crystal clear from the witness stand:

> Q.   So when the defendant is saying tell motherfuckers, who is he referring to?
>
> A.   His co-defendant.
>
> Q.   Can you say that --
>
> A.   Sherry Jones.

Like we said before, we aren't here to re-weigh the evidence or to second-guess whether the jury should have believed Dedrick.  See Pires, 138 F.4th at 658.  But we will conclude that between the jail calls and Dedrick's testimony, sufficient evidence supports Middleton's conviction.

### C

Middleton's third appellate argument seeks to undue his thirty-year sentence for being both procedurally and substantively unreasonable.  But before going any further or explaining what those terms mean, we need to explain why we won't be addressing any claim of procedural unreasonableness today.

As the government argues in its brief, Middleton's briefing does not "indicate[] what procedural aspect of his sentence was erroneously imposed." United States v. Candelario, 105 F.4th 20, 23 (1st Cir. 2024).[7]  Middleton alludes to some of

_____

[7] Middleton did not file a reply brief responding to the

- 22 -

the enhancements the court applied when calculating his guideline sentencing range, but he only notes that he lodged an objection below. Accordingly, we find any claim of procedural error waived for lack of development. Id. (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).

That leaves Middleton's claim of substantive unreasonableness for our consideration. On this front, Middleton argues the disparity between his sentence and those of his co-defendants' warrants relief, and that the 2006 Adam Walsh Act, which he says, "dramatically changed the statutory penalties for a variety of sex offenses," apparently set a guideline sentencing range beyond the bounds of reasonableness. Neither claim gets him very far.

We employ the abuse of discretion standard when considering a sentence's substantive reasonableness. E.g., United States v. Ayala-Vazquez, 751 F.3d 1, 32 (1st Cir. 2014).[8] "When we review the substantive reasonableness of a sentence, we're

_____

government's waiver argument.

[8] Middleton argues he should succeed on plain error review, though the government does not request we apply that demanding standard owed to unpreserved claims. As before, and because it does not change the outcome, we'll stick to abuse of discretion review. See United States v. Rodríguez-Adorno, 852 F.3d 168, 177 (1st Cir. 2017) (assuming the more favorable abuse of discretion standard applied); see also Pires, 138 F.4th at 666 ("[B]ecause the government did not argue [the defendant] failed to preserve this objection, we review for abuse of discretion.").

essentially making sure that the sentencing judge didn't act too harshly given the totality of the circumstances." United States v. Otero, 155 F.4th 78, 86 (1st Cir. 2025). Along those lines, "we will find that a sentence is substantively reasonable so long as the sentencing court has provided a plausible sentencing rationale and reached a defensible result." Id. (citation modified). And when considering "the universe of defensible results, a within-Guidelines sentence will almost always be defensible." Id.

There are a few more ground rules for the species of substantive unreasonableness Middleton alleges. First, "a sentencing disparity may only be ascertained between 'two identically situated defendants.'" United States v. De La Cruz, 91 F.4th 550, 555 (1st Cir. 2024) (quoting United States v. Grullon, 996 F.3d 21, 35 (1st Cir. 2021)). Which is "unusual to say the least." Id. (quoting Grullon, 996 F.3d at 35-36). And second, "our general rule of thumb is that a defendant is not entitled to a lighter sentence merely because his co-defendants received lighter sentences." Id. (citation modified). So, unless Middleton shows the right comparison between himself and his co-defendants, he cannot claim that a sentencing disparity exists. See id.

Rather than compare his situation to his co-defendants', Middleton comes right out and concedes that "[t]o be sure there

are distinctions among the defendants."  We agree, and need only quote Middleton's brief to explain why:

> Middleton was convicted after trial; the others did not go to trial.  Middleton has a prior record.  Middleton received an aggravating leadership adjustment and the others did not.  Middleton was convicted of attempted obstruction, while the others were no[t] charged with that offense.

We couldn't have said it better ourselves.  In light of these material differences between Middleton and his co-defendants, they were not identically situated, and the court did not discretionarily err in issuing disparate sentences.  See Ayala-Vazquez, 751 F.3d at 34 ("Accordingly, [the defendant's] life sentence is not substantively unreasonable simply because certain codefendants received more lenient sentences after they pleaded guilty."); see also United States v. Robertson, 162 F.4th 209, 251-52 (1st Cir. 2025) (explaining that differences in cooperation, counts of conviction, and sentencing enhancements were all material enough to justify disparate sentences).

As for Middleton's second argument of substantive unreasonableness related to the Adam Walsh Act, we're not totally sure what to make of it.  Middleton informs us that the Adam Walsh Act put in place a fifteen-year mandatory minimum sentence for § 1591 convictions, see Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587, 615, which led to the United States Sentencing Commission raising the base offense level

for this offense from 14 to 34, see U.S. Sent'g Comm'n. Amend. 701.[9]  Middleton then concedes "there is nothing wrong with Congress mandating certain penalties," but asks that we "consider" this "dramatic increase" brought by this Act back in 2006.

Consider it considered.  Congress's decision to impose a mandatory minimum sentence for violations of § 1591 and the corresponding increase in the guidelines' base offense level tell us next to nothing about why Middleton's within-guidelines sentence emerged from an implausible sentencing rationale or reflects an indefensible result.  Cf. United States v. Millán-Machuca, 991 F.3d 7, 29 (1st Cir. 2021) ("There is nothing unreasonable about imposing the sentence required by law."). Middleton has not carried his heavy burden of proving why his sentence is substantively unreasonable, so we leave his sentence untouched.

**D**

Middleton's final claim is that he received ineffective assistance of counsel during his trial in violation of his Sixth Amendment rights.  In just four sentences of briefing, Middleton

_____

[9] We've got volumes of caselaw examining base offense levels and the calculations building off them toward an individual defendant's total offense level.  See generally Otero, 155 F.4th at 81 n.5.  We need not mine that vein here and only note for the reader that higher base offense levels (and total offense levels) lead to higher sentencing ranges and, not surprisingly, longer prison sentences.

- 26 -

argues his conviction should be reversed on this basis because "his lawyer failed to cross-examine the key witness" for his obstruction charge, while also recognizing we do not typically consider ineffective assistance of counsel claims on direct appeal.

The latter point is correct, and sufficient to resolve this claim despite the government's plausible waiver argument due to Middleton's cursory briefing. Generally, our court has "held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions." United States v. Reyes-Ballista, 146 F.4th 100, 113 (1st Cir. 2025) (quoting United States v. Padilla-Galarza, 990 F.3d 60, 93 (1st Cir. 2021)). So, "[a]n individual seeking to press an ineffective assistance of counsel claim 'ordinarily must raise it in a collateral proceeding brought in the district court under 28 U.S.C. § 2255.'" Id. (quoting Padilla-Galarza, 990 F.3d at 94).

Middleton has not argued for the application of an exception to our rule, see id., thus, we see no reason to depart from our typical practice of dismissing ineffective assistance claims first raised on direct appeal, id. at 115. "And as we've done under similar circumstances, we do so without prejudice to [Middleton's] right to pursue all aspects of his ineffective

assistance claim in a proceeding for post-conviction relief under 28 U.S.C. § 2255."  Id.

### III

For the reasons just explained, we reject Middleton's appellate claims and **affirm**.  Middleton's Sixth Amendment claim is **dismissed without prejudice.**